MURRAY, Appellant,

v.

MURRAY, Appellee.

[Cite as *Murray v. Murray* (1999), 128 Ohio App.3d 662.]

Court of Appeals of Ohio,
Twelfth District, Warren County.

No. CA98–08–097.

Decided Feb. 8, 1999.

*Frost & Jacobs* and *Laurie K. Ahlers,* for appellant.

*Katz, Teller, Brant & Hild* and *Jerome S. Teller,* for appellee.

POWELL, Judge.

Plaintiff-appellant, Graeme Murray, appeals the decision of the Warren County Court of Common Pleas, Domestic Relations Division, granting the motion of defendant-appellee Susan Murray to modify child support and increasing appellant's child support obligation. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

Appellant and appellee were divorced in 1994. The parties entered into a separation agreement, which was incorporated into the final decree filed on May 16, 1994. Appellee was granted custody of their son, Iain, and appellant was to pay child support in the amount of $1,810 per month. The marital property was divided between the parties, including unexercised stock options appellant had received as an executive employee at Proctor & Gamble Company ("P&G").

Appellant's child support obligation was based upon his income at the time, which was $212,702 in salary and average bonuses. Then-existing unexercised stock options were not considered in determining child support because they were

dealt with in the property division. Since the divorce, appellant has remained at P&G, and his income has increased substantially.

On May 18, 1997, appellee filed a motion to modify child support, asserting that there had been a significant change in appellant's income warranting a recalculation of child support. Appellant stipulated his income had increased to $325,743 per year. This amount was composed of his base salary, average annual bonuses, dividends and interest, and taxable employee benefits, but not the stock options he had received in the years after the divorce. Appellant offered to pay $2,754 per month in child support based upon his stipulated income.

On January 29, 1998, a magistrate held a hearing on appellee's motion. The primary issues were whether appellant's unexercised P&G stock options should be included in his "gross income" for purposes of determining child support, and, if so, how to value the stock options. On May 18, 1998, the magistrate filed his decision, finding that the value of the P&G stock options should be imputed to appellant and included in "gross income" pursuant to R.C. 3113.215. Appellant's child support obligation was increased to $7,494.10 per month.

Appellant filed objections to the magistrate's decision. On July 23, 1998, the trial court overruled the objections and adopted the magistrate's decision. Appellant filed a motion to reconsider, arguing that the magistrate had erred in his calculations. On August 17, 1998, the trial court granted the motion, and ruled that the magistrate had incorrectly included the value of one option which the parties had included in appellant's stipulated income. The trial court reduced the imputed income to $481,109.60, which, in turn, reduced appellant's child support obligation to $6,821.27 per month, plus a processing fee.

Appellant appeals the July 23, 1998 decision, raising three assignments of error.

"Assignment of Error No. 1:

"The trial court erred to the prejudice of plaintiff–appellant by including imputed income attributable to unexercised employee stock options in gross income for the purpose of modifying plaintiff–appellant's child support obligation."

In his first assignment of error, appellant argues that the unexercised P&G stock options do not constitute "potential cash flow" and are not included in "gross income" as defined in R.C. 3113.215(A)(2). He asserts that the stock options are only marital property subject to division under R.C. 3105.171. Appellee responds that the stock options are deferred compensation and a source of "potential cash flow" included in "gross income."

The issue presented is one of first impression. This court has found no cases addressing the issue of whether unexercised stock options should be considered when determining the obligor's income for purposes of child support.

█ The trial court possesses considerable discretion in child support matters. The decision of the trial court will be reversed only if it is the product of an abuse of discretion. *Pauly v. Pauly* (1997), 80 Ohio St.3d 386, 390, 686 N.E.2d 1108, 1111. "Abuse of discretion" is described as "more than an error of law or judgment, it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

█ R.C. 3113.215 is a comprehensive enactment governing the procedures for awarding and calculating child support. Its provisions are mandatory in nature and must be followed literally and technically in all material respects. This is because the overriding concern of R.C. 3113.215 is the best interest of the child for whom support is being awarded. *Marker v. Grimm* (1992), 65 Ohio St.3d 139, 141–142, 601 N.E.2d 496, 497–499. The calculation of support must be made in accordance with the basic child support schedule set forth in R.C. 3113.215(D) and the applicable model worksheet in R.C. 3113.215(E) or (F). R.C. 3113.215(B)(1). If the court makes the proper calculations based upon the schedule and applicable worksheet, the amount shown on the worksheet is "rebuttably presumed" to be the correct amount of child support due. R.C. 3113.215(B)(1); *Rock v. Cabral* (1993), 67 Ohio St.3d 108, 110, 616 N.E.2d 218, 220–221. Any deviation from the child support guidelines, worksheet, or basic child support schedule must be made in full and strict compliance with the requirements of R.C. 3113.215(B)(1)(a) and (b), and the deviation must be supported by the evidence and stated in the trial court's findings of fact. *Marker, supra,* at syllabus.

The amount of child support to be paid by the obligor is based upon the obligor's "income." R.C. 3113.215(A)(1) defines "income" as, "[f]or a parent who is employed to full capacity, the gross income of the parent." R.C. 3113.215(A)(2) defines "gross income" as follows:

"[E]xcept as excluded in this division, the total of all earned and unearned income from all sources during the calendar year, whether or not the income is taxable, and includes, but is not limited to, income from salaries, wages, overtime pay and bonuses to the extent described in division (B)(5)(d) of this section, commissions, royalties, tips, rents, dividends, severance pay, pensions, interest, trust income, annuities, social security benefits, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, benefits received by and in the possession of the veteran who is the beneficiary for any service-

connected disability under a program or law administered by the United States department of veterans' affairs or veterans' administration, spousal support actually received from a person not a party to the support proceeding for which actual gross income is being determined, and all other sources of income; * * * self-generated income; and potential cash flow from any source."

The definition of "income" is intended to be both broad and flexible. See, *e.g.*, *Williams v. Williams* (1991), 74 Ohio App.3d 838, 843, 600 N.E.2d 739, 742–743. An expansive definition is necessary "to ensure that the best interests of children, the intended beneficiaries of child support awards, are protected." *McQuinn v. McQuinn* (1996), 110 Ohio App.3d 296, 300–301, 673 N.E.2d 1384, 1387.

R.C. 3113.215(A) excludes a variety of income sources from "gross income" under R.C. 3113.215(A)(2). Among these exclusions is a "nonrecurring or unsustainable income or cash flow item." R.C. 3113.215(A)(2)(e). "Nonrecurring or unsustainable income or cash flow item" is defined in R.C. 3113.215(A)(11) as "any income or cash flow item that the parent receives in any year or for any number of years not to exceed three years and that the parent does not expect to continue to receive on a regular basis. 'Nonrecurring or unsustainable income or cash flow item' does not include * * * any other item of income or cash flow that the parent receives or expects to receive for each year for a period of more than three years or that the parent receives and invests or otherwise utilizes to produce income or cash flow for a period of more than three years."

The question before this court is whether unexercised stock options, given by an employer as part of an executive compensation package, should be included in the recipient's "gross income." Appellant argues that the stock options at issue should not be included in his "gross income" because they have no present value to him. Instead, they are income only upon their exercise, which is the time that financial gain is realized. Appellee counters that the stock options are a form of deferred income given for present services and a potential source of cash flow. Appellee asserts that, even though appellant may not have exercised the options and realized income for tax purposes, both P & G and appellant consider the stock options package to be a primary component of his annual compensation.

Although no other court has addressed this issue, we are guided by decisions which have examined what may be included in "gross income." In *Pelikan v. Pelikan* (July 1, 1993), Cuyahoga App. No. 62962, unreported, 1993 WL 243076, the court held that the trial court properly included interest accruing on the obligor's public employee retirement plan. The court found that, even though annual increases in such funds are not taxable until actually distributed, they are to be included in the obligor's "gross income" pursuant to R.C. 3113.215(A)(2). *Id.* 1993 WL 243076, at 7. The decision in *Pelikan* was based upon the result in *Parzynski v. Parzynski* (1992), 85 Ohio App.3d 423, 620 N.E.2d 93, jurisdictional

motion overruled (1993), 67 Ohio St.3d 1450, 619 N.E.2d 419. In *Parzynski*, the court found that contributions by a company to a private pension on behalf of the obligor may be included as "gross income" under R.C. 3113.215(A)(2), since that code section does not provide any specific exclusion for such compensation. *Id.* at 436, 620 N.E.2d at 102. The stock options at issue are similar in that appreciation in the options' value is not taxed until the options are exercised, even though the options are given as compensation for services presently rendered.

In *Sizemore v. Sizemore* (Oct. 14, 1994), Montgomery App. No. 13673, unreported, 1994 WL 558917, the court found that the obligor's "gross income" included imputed interest on a loan he had given to a corporation which he owned. The trial court determined that the interest should be included in "gross income" as "potential cash flow from any source." *Id.* The court found it important that the choice to lend the money was solely that of the obligor, who had made an investment choice by not putting the money elsewhere. Furthermore, the income should be imputed because "one of the purposes of the 'potential cash flow' provision in R.C. 3113.215(A)(2) [is] to prevent a parent from avoiding child support obligations by shifting present income to a cash flow expected to be enjoyed at some future time, when the children have become emancipated[,]" and "[a] choice to defer income will not justify deferring or avoiding child support." *Id.* 1994 WL 558917, at 8.

██ In cases where the obligor is a majority shareholder in a corporation, the trial court may impute to the obligor the retained earnings of the corporation when determining child support. *Williams*, 74 Ohio App.3d at 843, 600 N.E.2d at 742–743. In the *Williams* case, the obligor owned fifty percent of the corporate stock at a time when the shareholder equity in the corporation increased by $75,000. The corporation's accountant testified that the increase in shareholder's equity was corporate income, but the court decided that the obligor's share in the increased equity could be imputed to him for purposes of calculating child support, even though he had not actually received any cash. *Id.* at 844, 600 N.E.2d at 743. The court reasoned that "[u]nder these circumstances and in light of the expansive definition of 'income' * * *, it would be grossly inequitable to allow [the obligor] to sit upon his assets, hide behind the shield of corporate business decisions, and prevent his children from enjoying the standard of living they would have enjoyed had the marriage continued." *Id.* at 843, 600 N.E.2d at 742. The court found it noteworthy that the obligor had discontinued his salary for tax benefits, but that he could recommence the salary payments at any time he desired. Also, the cash flow from the corporation to the obligor had remained steady due to the increase in shareholder equity. *Id.* at 844, 600 N.E.2d at 743.

██ With these authorities in mind, and considering the nature of the executive stock options in this case, we find that the appreciation in the value of the

options is to be included in "gross income" as defined by R.C. 3113.215(A)(2). The testimony presented in the hearing before the magistrate established that the stock options at issue are an integral part of appellant's annual compensation. Laurence Smiley ("Smiley"), P & G's Director of Global Compensation, testified about the nature of the stock options. The options are given every year and may only be exercised by appellant. The options may be exercised from one year after their grant up to ten years after their grant. In that time, exercise of the options is left solely to appellant's discretion. The price that appellant will pay for one year's option is set as the price on the date appellant is granted the option. When the option is exercised, appellant is responsible for any transaction costs and taxes.

Smiley testified that the growth of each option is the single most important element of appellant's complete compensation package, and that the options are recurring, sustainable compensation. Appellant can expect to receive the executive stock options so long as he continues to work in his position at P & G. Smiley testified that the stock options mirror deferred compensation. Deferred compensation may be included in "gross income" under R.C. 3113.215(A)(2). *Spencer v. Doyle* (Sept. 22, 1993), Greene App. No. 92–CA–46, unreported, 1993 WL 377177.

We find it significant that after the initial twelve months, appellant has complete discretion to exercise the options, so long as he remains an employee of P & G. In this respect, the option then becomes an investment choice, and its value may be imputed as part of appellant's "gross income." See *Sizemore, supra.* After the initial twelve months, he may exercise an option and immediately realize the income, or he may refuse to exercise the option and allow its value to increase. By choosing the latter, his deferred compensation increases as the value of the stock underlying the option increases. If we were to hold that executive stock options were not to be included in "gross income" pursuant to R.C. 3113.215(A)(2), an employee receiving such options would be able to shield a significant portion of his income from the courts, and deprive his children of the standard of living they would otherwise enjoy. This would be in direct contradiction of the very purpose of the child support statute, the child's best interest. See *Marker*, 65 Ohio St.3d at 141–142, 601 N.E.2d at 497–499.

The stock options at issue cannot be excluded from "gross income" as a "nonrecurring or unsustainable source of income or cash flow item" under R.C. 3113.215(A)(2)(e) and (A)(11). The options are granted annually to appellant as an integral part of his compensation package. Smiley testified that they may even be the most important aspect of appellant's yearly compensation. We are not persuaded by appellant's argument that the options must be excluded from "gross income" because they produce actual cash income only when exercised.

Appellant argues that the options are not income until exercised, but once exercised, they constitute nonrecurring income. If that were the case, the stock options could never be included in "gross income," because, before their exercise any appreciation in value is not realized, but once realized, it would be excluded as "nonrecurring income." Thus, an option holder, such as appellant, could prevent his children from having the benefit of the most important element of his yearly compensation. Such an individual would be shielded from bearing the child support obligation for which he should be responsible.

Appellant relies upon *Yost v. Unanue* (1996), 109 Ohio App.3d 294, 671 N.E.2d 1374, which held that exercised stock options are excluded from "gross income" as "nonrecurring income." The present case is distinguishable from *Yost.* The issue in that case was whether all of the money received when the options were exercised should be included in a single year's income. In the present case, we are concerned with whether the appreciation in the value of the stock options should be included when calculating appellant's "gross income." Furthermore, the parties in *Yost* had the opportunity to include in the original support order provisions which would account for the exercise of the then existing stock options. In the present case, the divorce decree accounted for all of the stock options which appellant possessed at the time of the divorce by treating the options as marital property. Thus, when the support order was issued with the divorce decree, there were not any options to be included in the income calculation.

The nature of the executive stock options leads this court to conclude that the options, once they may be exercised, are a source of "potential cash flow from any source" to be included in the parent's "gross income." Because appellant receives these options every year, and can expect to receive them every year in the future, we find that the options are not a "nonrecurring or unsustainable cash flow item" within the meaning of R.C. 3113.215(A)(11).

Accordingly, the first assignment of error is overruled.

"Assignment of Error No. 2:

"The trial court erred to the prejudice of plaintiff–appellant in failing to comply with O.R.C. 3113.215(B)(2)(b), (B)(2)(c), and (B)(3) in calculating plaintiff–appellant's child support obligation."

In his second assignment of error, appellant argues that the trial court failed to determine the child support based upon the needs and standard of living of the child and parents. Appellant asserts that a review of the factors listed in R.C. 3113.215(B)(3) weighs in favor of a deviation from the child support guidelines. Appellee counters that appellant did not request a deviation before either the magistrate or trial court, and that the trial court was not required to deviate from

the guidelines without a finding that the guideline amount would be unjust or inappropriate.

■ As noted above, the trial court possesses considerable discretion in matters of child support, and a trial court's determination will not be reversed absent a finding that the trial court abused its discretion. *Pauly*, 80 Ohio St.3d at 390, 686 N.E.2d at 1111. Because the terms of the child support statute are specific and mandatory, the trial court must follow the statute precisely, and failure to do so will constitute reversible error. *Marker*, 65 Ohio St.3d at 141–142, 601 N.E.2d at 497–499.

■ Using the obligor's "gross income" as a basis for determining the amount of child support to be paid, the trial court is to calculate the support obligation according to the schedule provided in R.C. 3113.215(D), and the worksheets in R.C. 3113.215(E) and (F). R.C. 3113.215(B)(1). When the combined income of both parents is greater than $150,000, the court shall determine the amount of child support "on a case-by-case basis and shall consider the needs and the standard of living of the children who are subject of the child support order and of the parents." R.C. 3113.215(B)(2)(b). In such cases, the appropriate standard for the amount of child support is "that amount necessary to maintain for the children the standard of living they would have enjoyed had the marriage continued." *Birath v. Birath* (1988), 53 Ohio App.3d 31, 37, 558 N.E.2d 63, 70.

The trial court must order a support award that is at least the same percentage of the parents' combined annual income that would result in the guidelines for $150,000 (10.145 percent). The court may deviate from this requirement only if it determines that it would be unjust, inappropriate, or not in the best interest of the child, obligor, or obligee to order that amount, and the trial court enters this determination in its journal with findings of fact supporting that determination. R.C. 3113.215(B)(2)(b) and (c); *Schultz v. Schultz* (1996), 110 Ohio App.3d 715, 721, 675 N.E.2d 55, 59. R.C. 3113.215(B)(3) lists a number of factors a trial court should consider in determining whether the calculated child support award is unjust, inappropriate, or not in the child's best interest. Nonetheless, if the court makes the proper calculations based upon the statutory guidelines, the amount shown on the worksheet is "rebuttably presumed" to be the correct amount of child support due. R.C. 3113.215(B)(1); *Rock*, 67 Ohio St.3d at 110, 616 N.E.2d at 220–221.

■ The party seeking to rebut the basic child support schedule has the burden of presenting evidence which demonstrates that the calculated award is unjust or inappropriate and would not be in the best interest of the child. *Halverstadt v. Halverstadt* (Aug. 27, 1991), Columbia App. No. 90–C–20, unreported, 1991 WL 168631. Furthermore, "[a]bsent a timely request for findings of

fact and conclusions of law, the trial court is not required to enter the same where, as here, the amount of the [child] support following modification did not deviate from the child support schedule." *Forest v. Forest* (1993), 82 Ohio App.3d 572, 574, 612 N.E.2d 815, 816.

 In the present case, the trial court did not abuse its discretion when it refused to deviate from the amount calculated in accordance with the child support guidelines. As mandated by the statute, the trial court calculated the child support according to the same percentage (10.145 percent) which would be applicable under the schedule and worksheets. Unless the trial court deviates from this amount, R.C. 3113.215 does not require that the court justify its decision.

In addition, the trial court did set forth the reasons for its decision in its July 23, 1998 entry. In that entry, the trial court specifically found that the calculated amount was in compliance with the guidelines, and that it was not unjust or inappropriate to require appellant to pay that amount. The trial court found that, although the child support obligation was a heavy one, appellant had ample resources with which to pay it. If appellant had sought to object to the findings of the trial court, appellant should have asked for findings of fact in accordance with Civ.R. 52. Only upon such a request would the trial court be required to further explain its decision. *Id.*

Accordingly, appellant's second assignment of error is overruled.

"Assignment of Error No. 3:

"The trial court erred to the prejudice of plaintiff–appellant in the method it used to value unexercised stock options for the purpose of attributing additional income to plaintiff–appellant in a child support modification proceeding."

In his final assignment of error, appellant argues that the trial court erred in its method of valuing his unexercised executive stock options. He asserts that the trial court arbitrarily chose one date on which to value the stock options, without sufficient reason given as to why that method was better than any other method available. We agree.

The magistrate and the trial court used a method of valuing the stock options which is commonly used in dividing marital property. That is, the trial court values the marital asset according to a specific date, one that is deemed reasonable under the facts and circumstances of the case. The reasoning is that it gives the trial court the greatest flexibility in fashioning an equitable division of the marital property. *Berish v. Berish* (1982), 69 Ohio St.2d 318, 321, 432 N.E.2d 183, 185.

The magistrate's decision set out in detail its process of valuing the P & G stock options. First, the options were valued according to the P & G stock price on April 1, 1998, which was $84.36 per share. The number of shares in each option was then multiplied by this price, and subtracted from the option price which appellant would have to pay to exercise the options. This yielded the "total deferred income" for each option. The total deferred income for each option was then divided by the number of months that the option had been outstanding, and multiplied this amount by twelve. This yielded an "average annual deferred income" for each option. The average annual deferred incomes for all of the options were then added together, yielding the "average aggregate annual deferred income" from the stock options, which was then added to appellant's stipulated income to calculate his "gross income" for purposes of determining child support.

By this method, the trial court treated the options in the same manner that overtime and bonuses may be treated under R.C. 3113.215. Pursuant to R.C. 3113.215(B)(5)(d) the trial court may calculate bonuses and overtime in two ways. The first of these is to average the overtime and bonuses from the previous three years when included in "gross income." Thus, in this case the trial court looked to four years worth of stock options, even though the trial court looked to only one year of base salary, that of 1997.

The magistrate determined the value of five stock options: one in 1994, one in 1995, two in 1996, and one in 1997. Using these five options, the magistrate imputed an average aggregate annual deferred income of $543,316. When added to appellant's stipulated income, his gross income was determined to be $869,059. Pursuant to the mandate of R.C. 3113.215, the magistrate calculated the child support to be $7,347.16 per month, or 10.145 percent of appellant's gross income, plus processing fee. The trial court subsequently modified the order, as the magistrate incorrectly included the second 1996 option. The trial court reduced the imputed income to $481,109.60, which reduced appellant's ordered child support obligation to $6,821.27 per month, plus a processing fee.

The trial court erred in its characterization of the stock options in relation to appellant's stipulated salary. Appellant and P & G both consider the stock options to be part of his yearly salary, albeit deferred until appellant exercises the options. But, while the trial court considered only one year's worth of stipulated salary, it considered all of the accumulated increases in the price of the stock underlying the stock options. Thus, the trial court treated the stock options in a manner inconsistent with its treatment of appellant's income in general. Instead, the trial court should have considered only the appreciation in the options' worth which accrued in the same year as appellant's stipulated income. By characterizing the options as a part of appellant's current salary, and

treating them as such, the yearly growth in the options is reflected as part of appellant's current compensation.

Thus, the trial court also erred when it treated the stock option in a manner similar to overtime and bonuses. Because only the most recent year's income was at issue, the trial court should have sought to account for the appreciation in the stock options' values for that year covered in the stipulated income. Such treatment would reflect the compensatory nature of the stock options.

Valuing stock options is difficult by nature. At the time of its grant, the option does not have a readily ascertainable value. As has been noted in a different context, "a nontransferable stock option that has an option price equal to the fair market value of the stock does not provide an immediate realization of income." *Rice v. Montgomery* (1995), 104 Ohio App.3d 776, 780, 663 N.E.2d 389, 391. Thus, appellant received no immediate income when the options were granted, since they were granted at the market price on the grant date. But, one year later, when the options could be exercised, the P & G stock price had significantly increased. "[T]he true value of stock options lies in their future exercise. * * * If stock options were valueless at the time of their grant, amounting to no more than a chance to buy stock at its present trading price—a right shared in common with everyone with access to the stock market—it is difficult to believe that stock options would be important considerations in executive compensation." *Id.* In this respect, "the true value of the stock option to its owner is the potential for appreciation in stock price without investment risk. If the stock price were to drop, the owner of the option simply would not exercise it because he could instead buy the stock more cheaply on the market." *Id.*

We cannot say that valuing the stock options according to the P & G stock price on one day, arbitrarily chosen, can accurately reflect the value of the stock options in the months before or after that date. As pointed out by appellant, had the trial court picked a different date, the value of the stock options could have been greatly reduced or inflated, and that the difference could amount to over $300,000 in aggregated income. When the choice of a single date has such important consequences in a case, that choice requires explanation. In the present case, no such explanation was given, other than that the trial court and magistrate felt that their method was "the most fair and appropriate way."

Any attempt to determine the current appreciation in value of appellant's options, and therefore determine his imputed income from the stock options, must be the most accurate and equitable method which the court can utilize. In this respect, we must note that financial models exist for calculating a value for stock options. Although these models are regularly used in the marketplace, they are designed to reflect market forces under certain conditions, and may not be

reliable for purposes of litigation. See *Chammah v. Chammah* (July 11, 1997), 1997 WL 414404 at *6, 1997 Conn.Super. LEXIS 1896, at *14–*15.[1]

We must therefore determine a method to value stock options which is relevant to the purposes of child support and will reliably reflect the imputed income from restricted stock options for the period of time at issue. In this regard, we find that the best way to value such stock options is to account for the options' appreciation in value as determined on the grant and exercise dates of the options which fall into the income year at issue. By this method, the options are valued according to the underlying stock price on the date most important to the options' holder, the date the options may be exercised and income realized. We believe that this is a simple, common-sense-based method which courts may reliably utilize for purposes of determining child support obligations.

Using this method, each grant is valued according to the stock price on the most recent date on which an option could be exercised minus the price on the day that option was granted. For example, to calculate the imputed income from the stock options for 1997, we would look to the prices relevant to the option first exercisable in 1997. This would be that option granted on February 29, 1996. That option was granted at a price of $40.9063. The evidence before the trial court established that the option could be exercised on February 28, 1997, when the P & G common stock price was $60.2188. Thus, in the year at issue, the P & G stock increased in value by $19.3125. This increase is then multiplied by the number of shares granted in the option, 6,808, yielding a gross imputed income for 1997 of $131,479.50 from the 1996 option.

A similar calculation is done for all preceding options, using these same values. We recognize that the options given in previous years accrued substantial worth before 1997. For example, the option granted on February 25, 1994 was given at a price of $28.4063. On February 29, 1996, when the 1996 option was granted, the P & G stock price was $40.9063, which means that the 1994 option had increased in worth by $12.50 per share before 1996. But, because this $12.50 increase occurred before 1997, it is attributable to appellant's income in those earlier years, not 1997. To determine the appreciation in the 1994 option's worth which occurred in 1997, we must use the prices relevant to that year, which will

---

1. The *Chammah* court was presented the Black–Scholes model, the prevailing financial model valuing stock options, and concluded:

"The court finds that the Black–Scholes method was created in 1973 for the purpose of evaluating stock options traded on the public market. The Black–Scholes method involves various components. Involved in the formula are the analysis of dividends, the volatility of stock and the lack of a known market for these 'contingent resources.' The Black–Scholes method also has a number of variations. No one Black–Scholes formula exists. The Black–Scholes method does not appear to be an accurate method for evaluating employment issued stock options in a marital context." *Id.*

be the same prices used above for the 1996 option. Therefore, we would multiply the eight thousand shares in the 1994 option by $19.3125, yielding a gross imputed income for 1997 of $154,000 from the 1994 option.

Performing this calculation for all of the options left unexercised in 1997, which would be the 1994, 1995, and 1996 options, and adding the results together, we arrive at a gross imputed income from the options of $421,167. A shorthand method of doing this calculation is to add together the total number of unexercised shares from all the options, and multiply this number by the stock price increase for the income year at issue. In this manner, the court can account for the appreciation in the value of the stock underlying the options which accrued in one year, without inadvertently considering appreciation which was gained in earlier years.

The calculated imputed appreciation from 1997, $421,167, is then added to appellant's stipulated income for 1997, $325,743. We then arrive at appellant's total "gross income" for purposes of child support, $746,910. This is the amount of income which the trial court would include in line fourteen on the worksheet.

We believe that the above method best captures the immediate appreciation in value the stock has gained due to appellant's choice not to exercise the options and allow their potential value to increase. Whenever appellant chooses not to exercise his options, he is making an investment choice, and he should not be allowed to benefit from such a choice by depriving his child of the substantial growth in the stock options' values. In addition, this method of calculating the imputed income by the anniversary date of the options eliminates the gamesmanship of the obligee choosing a high market day in an attempt to increase the child support while the obligor uses a low market day in an attempt to lessen the child support burden. Using this method, the trial court should calculate appellant's gross income for the most recent year before the court, and recalculate appellant's child support obligation.

The trial court's decision to adopt a date which had no relevant relation to the case and to value appellant's stock options according to this date was an abuse of the trial court's discretion. Furthermore, the trial court erred by considering income from years which were not before the court.

Accordingly, appellant's third assignment of error is sustained, and the cause must be remanded for recalculation of appellant's child support obligation.

The trial court affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.

*Judgment accordingly.*

WILLIAM W. YOUNG, P.J., and WALSH, J., concur.