[Cite as *Bajaj v. Green*, 2021-Ohio-3113.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

| | | |
|---|---|---|
| RISHI BAJAJ | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 2021-CA-7 |
| | : | |
| v. | : | Trial Court Case No. 21640007 |
| | : | |
| NITA GREEN | : | (Juvenile Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of September, 2021.

. . . . . . . . . . .

RISHI BAJAJ, 4958 Baycroft Drive, Hilliard, Ohio 43026
        Plaintiff-Appellant, Pro Se

LORRAINE SEARCH, Atty. Reg. No. 0093179, 6 South Second Street, Suite 309,
Hamilton, Ohio 45011
        Attorney for Defendant-Appellee

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Rishi Bajaj (Father) appeals from a judgment of the Darke County Court of Common Pleas, Juvenile Division, which, among other things, terminated the parties' shared parenting plan, declared Nita Green (Mother) the sole residential and custodial parent, and ordered Father to pay monthly child support of $719.80, including the processing fee.   For the following reasons, the trial court's judgment will be affirmed.

## I. Procedural History

{¶ 2} Father and Mother are the parents of M.J.B., born in 2015.   The parties have never been married.   In 2016, Father established paternity and sought custody and parenting time.   In March 2016, the trial court set a visitation schedule, noting that Father would be given "an interim credit toward child support for the extensive travel obligation being imposed upon him."

{¶ 3} In January 2017, the court issued an agreed order which, among other things, designated Mother as the custodial and residential parent, set parenting time, and ordered Father to pay monthly child support of $300 and provide medical insurance.

{¶ 4} In May 2017, Mother filed a motion for contempt and for a change in parenting time.   However, on December 5, 2017, the parties agreed to a shared parenting plan. Under that agreement, Mother remained the residential parent for school purposes only, Father had nearly equal parenting time, the parties agreed to meet at the halfway point when exchanging custody (they lived approximately two hours apart), and Father continued to pay child support of $300 and provide medical insurance.   The trial court adopted the agreed shared parenting plan on January 5, 2018.

{¶ 5} In October 2019, Mother sought termination of the shared parenting plan, to

be designated the custodial and residential parent, and modification of Father's parenting time. Father opposed Mother's motion and moved for legal custody of M.J.B. On September 14, 2020, the guardian ad litem (GAL) filed a report, which recommended that shared parenting remain in place. The report acknowledged that "[t]here are some challenges in this case," including the parties' different parenting styles, the distance between their residences (more than 100 miles), and communication issues. The report raised some concerns about Father's home visit. Soon thereafter, Father filed a motion for the appointment of a new guardian ad litem. That motion was overruled.

{¶ 6} On March 10, 2021, the juvenile court held a hearing on Mother's motion to terminate shared parenting, Father's motion for legal custody, and other motions. The record reflects that Mother appeared with counsel, and Father appeared without counsel. Mother, Father, Mother's sister and her husband, M.J.B.'s kindergarten teacher, and the GAL each testified.

{¶ 7} On April 15, 2021, the trial court terminated the parties' shared parenting, concluding that shared parenting was no longer in M.J.B.'s best interest, and designated Mother the residential and custodial parent. As for child support, the court ordered Father to pay $681.09 in child support, $24.60 in cash medical support, and a two percent processing fee of $14.11, for a total of $719.80 per month. The child support amount included a ten percent downward deviation from the calculated amount, which the trial court granted for "extraordinary travel and extended summer visitation." The child support worksheet was attached to the trial court's judgment.

{¶ 8} Father appeals from the trial court's judgment.

## II. Father's Appellate Brief and the Record on Appeal

{¶ 9} Father has filed a pro se appellate brief. The brief does not conform to the formatting requirements of App.R. 19, nor has Father set forth any assignments of error, as required by App.R. 16. Nevertheless, it is apparent that Father disagrees with the trial court's April 15, 2021 judgment, and he has raised several issues, including the trial court's failure to interview the child, the termination of shared parenting, and the increase in his child support obligation. In the interests of justice, we will consider the issues that Father raises. Mother has not filed a responsive brief.

{¶ 10} Father has attached several documents to his appellate brief in support of his challenge to the trial court's child support order. Father asserts that he cannot afford the court's child support amount, and those documents purport to show his monthly expenses. In reviewing the judgment on appeal, we are limited to the record before the trial court. *E.g., Kahler v. Eytcheson*, 2d Dist. Montgomery No. 23523, 2012-Ohio-208, ¶ 23. "An exhibit merely appended to an appellate brief is not part of the record, and we may not consider it in determining the appeal." *Williams v. Pioneer Credit Recovery, Inc.*, 2d Dist. Montgomery No. 28524, 2020-Ohio-397, ¶ 16, quoting *State v. Grant*, 10th Dist. Franklin No. 12AP-650, 2013-Ohio-2981, ¶ 12. Accordingly, we cannot consider the exhibits attached to Father's brief in resolving this appeal.

{¶ 11} We further note that Father has not provided a transcript of the March 10, 2021 hearing. Although the civil docketing statement filed with the notice of appeal requested a full transcript, the official court reporter filed a notice with the clerk of court, indicating that a cost estimate was provided to Father, and he indicated that he did not want the hearing transcribed. The App.R. 11(B) notification states that the request for a transcript of proceedings was cancelled on May 12, 2021.

### III. Termination of Shared Parenting

{¶ 12} Father argues, in essence, that the trial court erred when it terminated the parties' shared parenting plan, and he challenges some of the trial court's factual findings in support of that decision. In its judgment entry, the trial court provided a four-and-one-half-page summary of the testimony presented at the March 10, 2021 hearing. We reiterate the court's summary here.

{¶ 13} Father works as a computer programmer for the State of Ohio. He is in poor health and working from home. He stated that he has issues with anxiety and breathing. Father is originally from India, but has lived in the United States since 2002 and is an American citizen. Father has visited India four to six times.

{¶ 14} Father last saw M.J.B. in August or September 2020 and had had no contact with her since. Father explained that he was not visiting for medical reasons, but he texted Mother to ask about their child. He could identify M.J.B.'s doctor, but not her dentist. Father knew where M.J.B. went to school and followed her academic progress electronically via the school's Dojo app. M.J.B.'s kindergarten teacher had no concerns about M.J.B. The teacher had met Mother, but not Father, although Father had posted to the Dojo app.

{¶ 15} Father had a six-year-old son from another relationship. Father had shared parenting with his son's mother and a week-to-week schedule with his son, who was home-schooled. Father reported that M.J.B. "says bad things to his son such as that she doesn't love him." Father had a brother in Pennsylvania and another in Canada. M.J.B. knew Father's extended family through telephone contact.

{¶ 16} Father expressed concern about his child support going up, and "in fact

returned to that issue several times. He stated that his current work is uncertain and he's not guaranteed work in the future."

{¶ 17} M.J.B.'s aunt (Mother's sister) testified that M.J.B. had been unkempt following visits with Father. On one occasion in 2019, she picked up M.J.B. and found her to have a "full diaper." The aunt had to stop and buy M.J.B. new clothes. The aunt denied any anti-Indian sentiment in her family and noted that she also was married to a man of Indian descent. Her husband testified similarly.

{¶ 18} Mother testified that M.J.B. had lived primarily with her, and she had complied with the shared parenting schedule through September 2020. Mother testified that Father's last visit was the day before Labor Day, and Father had not explained why visitation had stopped. M.J.B. had asked Mother about Father and wanted to see him.

{¶ 19} Mother expressed having a "great deal of difficulty dealing with" Father, but she was not seeking to end his parenting time. Mother denied withholding any visits. Mother stated that she tried to communicate with Father but it often became "accusatory." She stated that there was a time when they communicated well, but not anymore. Mother denied withholding information about Father from M.J.B.'s school; she stated that he was listed as an emergency contact and she gave the teacher his cell phone numbers.

{¶ 20} Mother wanted authority to provide routine medical care for M.J.B. She did not oppose Father's providing emergency care, but would like notice. Father provided health insurance for M.J.B. Mother stated that she once tried to call M.J.B. during Father's parenting time and did not get a response; Mother wanted an order of phone contact during visitation. Mother had no problem with M.J.B. traveling with Father within the United States, as long as there was communication, but she had concerns about

M.J.B.'s traveling to India.   M.J.B. did not have a passport.

{¶ 21} Mother testified that she sends M.J.B. to Father in clean clothes.   She used to send a bag with M.J.B., but no longer does because the bag was not returned.   During the prior summer, M.J.B. would return to Mother's home in a pull-up diaper and not clean.   Mother stated that M.J.B. did not have accidents at her home.   Mother could not explain why M.J.B. would have accidents at Father's home, and Mother denied instructing M.J.B. to have accidents there.

{¶ 22} Mother requested that shared parenting be terminated.   Mother said that she would adhere to any court order or schedule, but she felt that it would be best for M.J.B. to "ease back in" when visits with Father resumed.   Mother proposed sharing Christmas Day and alternating Easter.   She requested a visitation order regarding the Darke County Fair.   Mother provided her 2018 and 2019 tax returns and provided a proposed child support worksheet.

{¶ 23} Mother acknowledged that Father was upset about M.J.B.'s starting school, which required an adjustment in the parenting time schedule.   Father wanted the parties to agree to jointly home school M.J.B.   Mother stated that she tried to contact Father about the issue but could not get a response.

{¶ 24} The guardian ad litem testified that she had visited both parents' homes. Father's home was "nice and in a nice neighborhood."   He was concerned about losing his parenting time.   The GAL had already spoken with Father when she went to visit Mother's home.   Mother has a son from a prior relationship who also lives with her.

{¶ 25} The GAL was very impressed with M.J.B.   She testified that she would not want M.J.B. to move from her current school and doctors, and she did not want to give

an opinion regarding a proposed trip to India, which is not in the Hague Convention. The GAL expressed that she wished the parties had better communication, but she thought the parties could still cooperate. She noted that Mother had complied with visitation even when she (Mother) did not like it. The GAL was surprised that M.J.B. had not visited Father since September, but she did not want to hold COVID against him. The GAL had not followed up since her report was submitted in September.

{¶ 26} In its judgment, the trial court concluded that the parties "have significant difficulty communicating and cooperating for the best interests of [M.J.B.]. The physical distance between the parties creates additional barriers to shared parenting. And while the Guardian ad Litem recommended a continuance of shared parenting, her recommendation was made prior to the six month period in which [M.J.B.] and [Father] have had no contact. [The GAL] did not hear all of the same evidence the Court did." The court noted that Mother had requested a termination of shared parenting, and while Father testified that he believed the parties could continue with shared parenting, he also requested custody of the child. Neither party had submitted a proposed shared parenting plan.

{¶ 27} On appeal, Father disputes that the parties had a disagreement about the child's attending public school in the school district where Mother lives, that he did not try to contact his child during the months when the child did not go to his home, and that the child had not been to his home since September 2020. With respect to the lack of parenting time, Father states that he "very clearly mentioned to court during the hearing that I was sick and was under medication and I didn't think it was safe for me [to] drive with 2 kids [presumably, M.J.B. and his son] for 2 hours while under medication."

{¶ 28} "R.C. 3109.04 establishes the process for allocating parental rights and responsibilities between the parents of a minor child." *Bruns v. Green*, 163 Ohio St.3d 43, 2020-Ohio-4787, 168 N.E.3d 396, ¶ 8. Of relevance here, R.C. 3109.04(E)(2)(c) permits a court to terminate a shared parenting decree if it determines that shared parenting is not in the child's best interest. *E.g., In re S.J.S.*, 2d Dist. Montgomery No. 28801, 2020-Ohio-5105, ¶ 84-85. "[A] trial court is not required to find a change in circumstances, in addition to considering the best interest of the child, before terminating a shared-parenting plan and decree and designating one parent as the residential parent and legal custodian." *Bruns* at ¶ 21.

{¶ 29} In determining whether shared parenting is in the best interest of the child, the trial court must consider all relevant factors, including, but not limited to, the factors in R.C. 3109.04(F)(1), the factors enumerated in R.C. 3119.23, and all of the following factors:

> (a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;
>
> (b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;
>
> (c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;
>
> (d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;
>
> (e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

R.C. 3109.04(F)(2).

{¶ 30} The factors stated in R.C. 3109.04(F)(1) include:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers * * *, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments * * *;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 31} "The discretion which a trial court enjoys in custody matters should be

afforded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." (Citations omitted.) *Tellis v. Tellis*, 2d Dist. Montgomery No. 29020, 2021-Ohio-1976, ¶ 11.

**{¶ 32}** We find no abuse of discretion in this case. In the absence of a transcript, we have no basis to review the trial court's summary of the testimony at the hearing and we presume the court's judgment reflects what occurred. In short, Father's challenges to the court's factual findings are not demonstrated by the record.

**{¶ 33}** In addition, accepting the trial court's findings, the trial court reasonably concluded that shared parenting was no longer in M.J.B.'s best interest and that it was in her best interest for Mother to be the residential and custodial parent. The parties live two hours apart, M.J.B. had reached school age, and the parties' communication had deteriorated. At the time of the hearing, M.J.B. had not visited with Father in six months, and Father was in poor health. M.J.B. was excelling in her school district and in Mother's care.

**{¶ 34}** Father's challenge to the trial court's termination of share parenting is overruled.

### IV. Child Support Calculation

**{¶ 35}** Father also challenges the trial court's calculation of child support. He states that he has several financial obligations and cannot afford the increase of total child support from $300 to $719.80 per month. Father asks that we lower his child obligation back to $300 or to a more affordable level.

{¶ 36} When calculating child support, the trial court must use the worksheet set forth in R.C. 3119.022 combined with the basic schedule set forth in R.C. 3119.021. R.C. 3119.02; *Landis v. Landis*, 2d Dist. Montgomery No. 28631, 2020-Ohio-6768, ¶ 45. The amount of child support established by this calculation produces a rebuttable presumption of the proper amount of child support. R.C. 3119.03; *Marker v. Grimm*, 65 Ohio St.3d 139, 141, 601 N.E.2d 496 (1992). The court is not required to accept any calculations in a worksheet prepared by a party. R.C. 3119.02.

{¶ 37} A parent's child-support obligation is generally based on that parent's "gross income," which is generally "the total of all earned and unearned income from all sources during a calendar year." R.C. 3119.01(C)(7); *In re K.P.*, 2d Dist. Clark No. 2011-CA-68, 2012-Ohio-1094, ¶ 11. The parents' current and past income and personal earnings must be verified by electronic means or with suitable documents. R.C. 3119.05(A). Such documents include, but are not limited to, paystubs, employer statements, receipts and expense vouchers related to self-generated income, tax returns, and all supporting documentation and schedules for the tax returns. *Id.*; *Williams*, 2d Dist. Montgomery No. 28917, 2021-Ohio-1339, at ¶ 25.

{¶ 38} We have commented that tax returns usually are not sufficient by themselves to establish gross income. *Williams* at ¶ 25, quoting *In re K.P.* at ¶ 12. This is because "the theory behind determining income for child support purposes is different from that of stating income for tax purposes." *In re K.P.* at ¶ 12, quoting *Offenberg v. Offenberg*, 8th Dist. Cuyahoga App. Nos. 78885, 78886, 79425, and 79426, 2003-Ohio-269, ¶ 29. In many cases, a parent's taxable income is not the same as the income available for purposes of child support. *Id.*

{¶ 39} R.C. 3119.22 allows the court to order a deviation from its calculated child support amount after considering the 17 factors in R.C. 3119.23. Those factors allow for a deviation due to, among other things, the parties' relative financial resources, the responsibility of each parent for the support of others, and "[e]xtended parenting time or extraordinary costs associated with parenting time, including extraordinary travel expenses when exchanging the child or children for parenting time." R.C. 3119.23(C), (E), (M). In general, the court must reduce the annual child support obligation by 10 percent when court-ordered parenting time equals or exceeds 90 overnights per year. R.C. 3119.051. This 10-percent reduction may be in addition to the other deviations and reductions. *Id*.; R.C. 3119.231.

{¶ 40} Pursuant to R.C. 3119.27, a court that issues or modifies a child support order must impose on the obligor a "processing charge in the amount of two per cent of the support payment to be collected under a support order."

{¶ 41} "The party seeking to rebut the basic child support schedule has the burden of presenting evidence which demonstrates that the calculated award is unjust or inappropriate and would not be in the best interest of the child." *Murray v. Murray*, 128 Ohio App.3d 662, 671, 716 N.E.2d 288 (12th Dist.1999); *Landis,* 2d Dist. Montgomery No. 28631, 2020-Ohio-6768, at ¶ 45.

{¶ 42} We review a trial court's decision imposing or modifying child support for an abuse of discretion. *Matlock v. Matlock*, 2d Dist. Montgomery No. 28278, 2019-Ohio-2131, ¶ 12. However, the court's determination of gross income for purposes of calculating child support is a factual finding, which we will not reverse if there is some competent and credible evidence in the record supporting that determination. *Williams*

*v. Williams*, 2d Dist. Montgomery No. 28917, 2021-Ohio-1339, ¶ 23.

{¶ 43} According to the trial court's judgment entry, "[a]ll of the financial exhibits were introduced by Ms. Green through counsel." The court stated that Mother had identified her 2018 and 2019 tax returns, as well as a proposed child support worksheet; Father identified his 2018 and 2020 tax returns. The trial court commented that it did "not know why these particular exhibits were chosen." There is no suggestion that Father provided any financial documentation to the court or offered a proposed child support worksheet.

{¶ 44} The record includes Mother's exhibit list, filed February 9, 2020, which included Mother's and Father's federal income tax returns for 2018 and 2019. Mother's exhibits were filed following the hearing. Those documents consisted of Father's federal income tax returns (Form 1040 only) for 2018 and 2019 (Exhibit 1); Father's federal and Ohio income tax returns, with supporting schedules, for 2020 (Exhibit 4); Mother's federal income tax returns for 2018 and 2019 (Exhibits 2 and 3); and proposed child support computation worksheets (Exhibit 5). The trial court's judgment, however, did not reference all of these exhibits, specifically Father's 2019 tax return. In the absence of a transcript of the hearing, we must accept that only the exhibits noted in the trial court's judgment entry were offered at the March 10, 2021 hearing.

{¶ 45} In determining Father's new child support obligation, the trial court used a child support computation worksheet, which it attached to its judgment entry. The court also made the following findings:

> Mr. Bajaj was clearly concerned about his potential child support obligation. He testified that his current income was not certain to continue

due to a number of factors. He did not provide any evidence of this other than his own testimony.

The Court would have liked to see three years for both parties. The Court also would have liked to have more specifics on how and why Mr. Bajaj's income might decrease in the future.

Given all the factors and the evidence presented, the Court finds that in these particular circumstances it would be best and most fair to average the years of the tax returns presented. The Court will grant Mr. Bajaj a 10% deviation combined for extraordinary travel and extended summer visitation. The Court further finds it appropriate to make these orders effective upon the filing date of the Judgment Entry. The Court believes these findings are in the minor's best interests.

Based on its calculations, including the 10 percent deviation, the court ordered Father to pay $719.80 per month, consisting of $691.08 for child support, $24.60 for cash medical support, and a two percent processing charge. We find no error in the court's order.

{¶ 46} The parties' tax returns showed that Father had wages of $74,414 in 2018 and $101,370 in 2020, which averaged to $87,892, and that Mother's average wage, based on her 2018 and 2019 tax returns, was $27,182. The trial court used these averaged amounts as the parties' gross income for the child support calculation worksheet. It did not use Father's adjusted gross income, which accounted for significant expenses related to rental property. The trial court ordered a 10 percent downward deviation of Father's calculated child support obligations for "extraordinary travel and extended summer visitation."

{¶ 47} With the limited record before us, the trial court's determination of the parties' gross income was supported by competent and credible evidence. We have reviewed the trial court's child support computation worksheet, and we find no abuse of discretion in the calculation of Father's child support obligation. Accordingly, Father's challenge to his child support obligation is overruled.

### V. Interview of the Child

{¶ 48} Finally, Father raises concerns that M.J.B. has been exposed to racist/discriminatory views and has made inappropriate comments. He asserts that M.J.B. should have been interviewed about this matter. Father states that he raised his concerns with Mother and the guardian ad litem and asked the court to interview the child, but his request was denied.

{¶ 49} "A court's authority to conduct in camera interviews with children who are the subject of custody proceedings is conferred by statute." *Jackson v. Herron*, 11th Dist. Lake No. 2003-L-145, 2005-Ohio-4046, ¶ 16. In determining the child's best interest for purposes of allocating parental rights and responsibilities and of resolving any issues related to the making of that allocation, "the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation." R.C. 3109.04(B). "The purpose of an in camera interview of children in custody proceedings is 'to provide children with a forum for openly discussing their concerns and preferences regarding their own custody' outside the presence of the parties." *In re A.H.*, 8th Dist. Cuyahoga No. 108107, 2019-Ohio-4063, ¶ 63, quoting *Jackson* at ¶ 17.

{¶ 50} In this case, Father did not request that M.J.B. be interviewed regarding her

wishes regarding custody. Rather, Father asserts that M.J.B. has made disparaging statements about people from India, and he has sought to have M.J.B. questioned about the source of those statements. Given the nature of the issue, the trial court was not statutorily required to conduct an in camera interview of M.J.B. regarding her statements.

{¶ 51} Although we have no transcript of the March 10, 2021 hearing, the trial court's summary of the evidence reflects that several witnesses addressed whether there was any family bias against individuals from India or of Indian descent. According to the trial court's judgment, Mother's sister denied any anti-Indian sentiment in her family and noted that she was married to a man of Indian descent. The aunt had, in fact, traveled to India. Her husband (Mother's brother-in-law) "essentially reiterated the same things his wife said."

{¶ 52} Although there is no indication that the GAL addressed M.J.B.'s alleged statements in her hearing testimony, the GAL had previously informed the court (in a response to the motion to remove the GAL) that she believed it was not appropriate to question M.J.B. about the alleged bias given M.J.B.'s young age (five years old). The GAL stated that M.J.B. was not "of the age to truly understand those questions."

{¶ 53} In our view, the trial court did not abuse its discretion in failing to interview M.J.B. about her alleged insensitive statements, nor did the guardian ad litem act unreasonably in failing to question M.J.B. directly about those statements.

{¶ 54} Father's challenge to the trial court's failure to interview the child is overruled.

## VI. Conclusion

{¶ 55} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .


TUCKER, P. J. and WELBAUM, J., concur.


Copies sent to:

Rishi Bajaj
Lorraine Search
Stephanie A. Gunter
Hon. Jason Aslinger