[Cite as *In re S.J.S.*, 2020-Ohio-5105.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: S.J.S.

:
:
:
:         Appellate Case No. 28801
:
:         Trial Court Case No. 2016-1135
:
:         (Appeal from Common Pleas Court-
:         Juvenile Division)
:
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of October, 2020.

. . . . . . . . . . .

APRIL H. MOORE, Atty. Reg. No. 0084711, 1354 North Monroe Drive, Suite B, Xenia, Ohio 45385
     Attorney for Appellant, Mother

KEITH R. KEARNEY, Atty. Reg. No. 0003191, 2160 Kettering Tower, 40 North Main Street, Dayton, Ohio 45423
     Attorney for Appellee, Father

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted custody of her son, S.J.S., to Father and granted Mother parenting time pursuant to the standard order. We affirm the judgment of the juvenile court.

{¶ 2} The juvenile court held hearings on May 23, 2018, September 6, 2018, and December 6, 2018. At the hearings, the court considered several motions by each party, including Mother's motions to terminate shared parenting, for a change of custody, for changes to child support, for a finding of contempt, and to suspend/amend parenting time, and several motions by Father to find Mother in contempt.

{¶ 3} At the start of the May 23, 2018, hearing, the court noted that, in January 2018, Mother had filed a motion for an ex parte order suspending Father's parenting time due to the fact that the domestic relations court had granted Mother's petition for an ex parte civil protection order that named S.J.S. as a protected party. The order was granted. The juvenile court noted that Mother had subsequently dismissed her petition, and Father had filed a motion to vacate the interim order suspending his parenting time. The juvenile court granted Father's motion on March 7, 2018. The court noted that Mother had objected to the court's decision, and so, at the hearing, the court would also consider the issue of whether the ex parte order should have been vacated.

{¶ 4} S.J.S. was three or four years old at the time of the hearings. The testimony at the hearings was as follows:

{¶ 5} Frances Duncan, a licensed psychotherapist, testified that S.J.S. had been her client since December 2016. She saw him two or three times a month. Duncan stated that S.J.S. had alleged that his father had physically abused him; Duncan observed

"bruises and marks" on the child on January 11, 2018. She stated that S.J.S. also had "a[n] extremely difficult time" with his speech. According to Duncan, S.J.S. continued to report abuse until March or early April, when he "seemed to kind of calm down" and "stopped talking about his father at all." Duncan stated that she was a mandated reporter of child abuse and that she contacted Montgomery County Children's Services ("MCCS") about S.J.S. Duncan testified that she observed photographs of S.J.S.'s bruises on Mother's phone, which "fit with what he was demonstrating" to her "being hurt all over his body." The photos were time-stamped January 7, 2018.

{¶ 6} On cross-examination, Father's attorney questioned Duncan about MCCS's investigation into her report of abuse and its determination that the allegations were unsubstantiated. Duncan acknowledged that the report of the guardian ad litem ("GAL") "wasn't favorable" to Mother. She stated that only Mother brought S.J.S. to his appointments. On cross-examination by the GAL, Duncan stated that she did not recall seeing any bruising on S.J.S. between December 2016 and January 11, 2018.

{¶ 7} Father testified that he last saw S.J.S. on January 7, 2018. He testified that Mother had filed four domestic violence allegations against him, and that they were all voluntarily dismissed by her, the last one on the day of trial. Father testified that he took photographs of S.J.S. before returning him to Mother, and that he did so on January 7, 2018, at 5:55 p.m. He then returned S.J.S. to Mother at 6:30 p.m. that day. Father stated that, in the January 2018 domestic violence petition, Mother indicated that S.J.S. had bruising and long scratches on his lower back and bruising on his knees. He identified a photo he took of S.J.S. on January 7, 2018, and he testified that no bruising or scratching appeared on the child's back. Father testified that bruising on S.J.S.'s

knees was from "[n]ormal play," and that S.J.S. was "always extremely active." Father played a January 7, 2018 video of S.J.S. falling down while playing tag in a hallway at Father's home; Father took a photograph of the resulting "minor bruises" on the child's knees and shins. Father stated that he had never harmed S.J.S. He also played a recording of S.J.S. saying that Mother was mean to him and hit him.

{¶ 8} Father testified that he was contacted by MCCS about the January 7, 2018 allegations, that he cooperated with its investigation, and that MCCS found no evidence of abuse. Father testified that there had been four separate investigations of abuse, all of which had been closed as unsubstantiated. Father wanted his parenting time reinstated. At the conclusion of the May hearing, the court vacated its ex parte order and reinstated Father's parenting time.

{¶ 9} At the September hearing, Melanie Edwards testified that she had been S.J.S.'s caregiver since August 2015. According to Edwards, she witnessed Mother and Father exchange custody of S.J.S. in 2017; on that occasion, S.J.S. clung to his mother "the whole time," and as soon as Father approached Mother, he said, "give me my son" in a very mean, aggressive way, and S.J.S. was "screaming and crying, no, no." Father had to "pull" S.J.S. out of Mother's arms. Edwards testified that she "absolutely" did not have any concerns about Mother's parenting ability. Edwards also testified that S.J.S, "always had bruises on him" when he returned. She stated that, in the previous year, S.J.S. had repeatedly overeaten and vomited upon returning from Father's care.

{¶ 10} On cross-examination by the GAL, Edwards acknowledged that she had had back surgery and had not cared for S.J.S. since the summer of 2018. She stated that she cared for S.J.S. "occasionally" during the 2017-18 school year, when he was

attending preschool, but not full-time.

{¶ 11} Duncan testified again at the September hearing. She testified that she specialized in treating trauma and physical and sexual abuse; particularly in children; she was one of the few therapists in the area that worked with very young children. She testified that, when she began counseling S.J.S., Mother was concerned that he had been coming back from visits with Father with bruises and was having some sleep disturbance and being "clingy" with her. Duncan worked with S.J.S. to be able to identify and express his feelings, seeing him twice a month. Duncan testified that she met Father in person one time and spoke to him on the phone three times; she had never observed him interact with S.J.S. Duncan testified that Mother and S.J.S. had "a close bond," were playful and comfortable with one another, and seemed to have a lot of love for each other.

{¶ 12} Duncan testified that she had not observed Mother speak negatively of Father in S.J.S.'s presence. Duncan observed S.J.S. prior to the January 2018 ex parte protection order. She stated that, at that time, he made "statements about being in a bedroom in the dark, and he couldn't get out. * * * He would sometimes say his dad hit him, but he wasn't specific about that." With respect to their session in January 2018, Duncan testified that Mother showed her photos of bruising and marks on S.J.S., and Duncan testified that the most striking thing she observed during that session was S.J.S.'s difficulty speaking, which was "very pronounced." He struggled to say even one word. He was also clingy to his mother, very tearful, and crying. Duncan testified that S.J.S. was usually "a very verbal little boy."

{¶ 13} According to Duncan, S.J.S's speech did not return to what she considered his "normal" speech until about mid-March. Then he started talking about the alleged

abuse, describing "his father hitting him all over his body, his dad punching him in the stomach, his dad locking him in the bedroom and how he was so, so scared." Duncan stated that she was aware of the January ex parte protection order. She stated that, after Father's parenting time was reinstated, S.J.S. "didn't allege any other physical abuse," but he made comments "like his dad said sorry for hitting him," "his dad's being nice now," and he was happy that his dad was being nice. Duncan testified that S.J.S. still sometimes talked about being locked in the bedroom, but he also talked about having "super powers" and eating a lot of food to be strong so he could break the door down, "but he didn't say that it was happening * * * between then and now." Duncan stated that Mother was present for the beginning of each session, and then Duncan met with S.J.S. individually.

{¶ 14} Duncan testified that S.J.S. had said he was scared of Father but not Mother, and that he had never reported being hit by Mother or being locked in a room by her. She stated that, when S.J.S. regained his speaking ability, he had used his hands to demonstrate his father hitting him. She stated that she had not observed a child who could speak as clearly as S.J.S. "have that much difficulty with speech over that period of time." According to Duncan, S.J.S. was very comfortable with her and "very open and expressive." He had described the alleged physical abuse several times, including his father hitting him, and because Duncan thought that "[c]hildren are more honest that probably most adults," she had concerns about his allegations.

{¶ 15} On redirect examination, Duncan testified that she worked with S.J.S. in an "emotional close kind of setting'" and that she was someone he could trust and knew well, so she believed he would be more open and comfortable with her than he might be with

others who don't know him or have different or limited contact with him.

{¶ 16} S.J.S.'s maternal grandmother ("Maternal Grandmother") testified that she sees him at least two to three times a week when he is in Mother's care and at the exchanges on Sundays. When asked how Mother and child interact, Maternal Grandmother testified that "it's very warm," relaxed, and playful. She testified that they have a "very good relationship." Maternal Grandmother testified that Mother does not speak negatively of Father to S.J.S., and Maternal Grandmother had observed Mother's encouraging a loving relationship between Father and S.J.S. Maternal Grandmother testified that, as soon as S.J.S. learns that he is going to his father, "he starts to cry; he starts to beg; he doesn't want to go." Maternal Grandmother testified that Mother allowed S.J.S. to spend time with Father's family.

{¶ 17} Maternal Grandmother testified that, on December 23, 2015, she refused to allow Father to pick up the child from Mother's home. According to Maternal Grandmother, she simply wanted make sure S.J.S. was buckled in his car seat correctly, but Father refused to allow her to get near his car. Maternal Grandmother called for a peace officer, but Father left before the officer arrived "so that he could go on with his visit." Grandmother testified that she had observed marks or bruising on S.J.S. "many times," beginning perhaps in January 2016, when he returned from Father's house with bruising on his face, body, and legs; he was also "vomiting, gorging." She stated that she observed such marks and behavior seven to ten times, but did not remember all the dates. The last time was in January 2018, when she "observed some pretty bad bruising around both sides of the ankles, both tops of the knees, [and] his back."

{¶ 18} On cross-examination by Father's counsel, Maternal Grandmother

acknowledged that Mother had had trouble maintaining employment and took medication for anxiety. She stated that Mother was "becoming a nurse." On redirect examination, Maternal Grandmother testified that S.J.S. missed every other week of preschool due to the parenting schedule.

{¶ 19} S.J.S.'s maternal aunt ("Aunt") testified that she was very involved in his life. She described the child's relationship with Mother as "[v]ery warm, loving, he's very comfortable with his mom." She testified that Mother facilitated visits with Father and S.J.S. even before there was court ordered parenting time. Aunt stated that Father's interactions with S.J.S. "were good at first," when the child was less than two years old, trying to engage and get S.J.S. to play and interact. Aunt stated that she witnessed interactions between Father and S.J.S. at the beginning of 2016, when the "week on/week off visitations" began, and after "the initial makeup parenting time" in December 2015 into January 2016, S.J.S. "was a little * * * quiet, a little not himself" when returned home; he also became anxious when had to go back to his dad, "crying, begging not to go," which had continued "every visit since."

{¶ 20} Aunt stated that Mother did not speak negatively about Father to S.J.S. and encouraged S.J.S. to have a good relationship with Father. Aunt stated that she has no concerns about Mother's ability to parent S.J.S. or to provide a safe and stable environment for him. Aunt testified that, when S.J.S. returned from time with Father, he often had bruising "in odd placements that wouldn't be normal, like consistent with falls." Specifically, she stated that in January and May 2016, she observed bruises on his face. In January 2018, she observed severe bruising on his legs, scratches on his back, bruising on his head. Aunt testified that, one time, she used the word "Dad,"

referring to her own father, while in S.J.S.'s presence, and S.J.S. "immediately dropped down to the ground and was screaming and crying"; it took "a good half hour" to calm him down enough to get him in the car. Once in the car, S.J.S. asked Aunt "not to get on the highway to go to [his] dad's, so [she] took the back roads to go to [her own] dad's."

{¶ 21} The GAL had not spoken to S.J.S., but that he had observed him once at Mother's house and once at Father's house. The GAL also spoke to Duncan twice. The GAL testified that, because S.J.S. was only four years of age, he (the GAL) did not want to interview him privately "in light of the facts and circumstances of this case and the fact that he was in counseling." The GAL stated that he had previously filed a motion for an in camera interview with the child, because Mother and Father "seemed mutually disappointed that [he] hadn't interviewed [S.J.S.] privately," but the GAL withdrew the motion based on the court's "assurance" that the court would likely find that a four-year-old did not have the wherewithal to express his wishes and concerns.

{¶ 22} The GAL testified that, based on his observations of the child with his parents, he did not have any concerns about Mother's or Father's parenting ability. With respect to Mother's parenting, he testified that she seemed to be "overly demonstrative," trying to show him what a good parent she was, and she seem to be within inches of the child throughout most of the visit. According to the GAL, he and Mother had arrived at her home at the same time, and Mother seemed to have difficulty coaxing the child out of the car; she did ultimately get him out of the car, but the GAL "wondered why, if that's a concern."

{¶ 23} The GAL further testified that he toured Mother's home, and there were hundreds of photos of the child everywhere, but Father was not in a single photo, which

the GAL thought was "kind of odd." The GAL stated that Father's home had some photographs on the walls, but there were fewer personal items, and it was more "Spartan."

{¶ 24} The GAL testified that his written report was more accurate than his recollection, because his process was to immediately dictate his report when he returned to his office after meeting someone or talking with someone.

{¶ 25} The GAL testified that, during his involvement in the case, Father had not had any parenting time at all for five months, and it appeared to the GAL that Mother had interfered with Father's parenting time. In his report, in reference to S.J.S.'s paternal grandfather's statement to the GAL that he had not observed Mother attempting to keep S.J.S. from Father, the report stated, "I suppose he did not see her file the domestic violence cases. * * * I suppose he did not observe their interactions at exchanges. I suppose he wasn't privy to their texts or their e-mails or their phone conversations * * *."

{¶ 26} The GAL testified that Grandmother's and Aunt's testimonies were consistent with what they reported to him, but he was concerned about "a lot of conflicting information" and that only people closely connected to Mother were "saying they saw those things." When asked if Grandmother's and Aunt's reports of bruising caused him to be concerned about S.J.S. while in Father's care, the GAL responded negatively. He testified that, based on all the other information that he collected, "lots of others" never saw signs of abuse. The GAL stated that the child's physician reported bruising twice in 2016, and the GAL noted that, on those occasions, there were a five-day delay and a four-day delay between when the child was returned to Mother and when she took him to the doctor. He stated that, if Mother was taking a child to the doctor to prove the child had been bruised during Father's parenting time, it seemed that she would have done so

"immediately after that parenting time concluded," and she did not. The GAL stated that he did not "know what to believe about who's causing the bruises," whether they were a result of play or abuse, but based on all the information he had gathered, he did not believe that the injuries were happening during Father's parenting time.

{¶ 27} When asked about S.J.S.'s speech regression, the GAL indicated his awareness of the issue, but he also stated that the child's physician (who saw bruises in 2016) met with S.J.S. in January 2018 and "saw nothing unusual or inappropriate about the child's speech" at that time; he also did not see any bruising at that time. S.J.S.'s doctor also told the GAL that he was not aware of an association between stuttering and abuse he felt stuttering was "developmentally normal" for the child; nonetheless, the doctor made a referral for speech therapy, but he understood that Mother had declined to pursue it. The GAL did not have any direct knowledge of whether Mother had declined speech therapy, but when he had his final meeting with her, she provided documentation that S.J.S. had had some speech therapy at his preschool; however, when the GAL contacted the preschool, he learned that S.J.S. "largely did not attend the preschool between January and May," calling into question whether he had received such therapy.

{¶ 28} When asked if Duncan's testimony caused him concern, the GAL responded that it did not cause him concern at the time of the September hearing, because he had not heard anything new that day, the only pictures of bruising he had seen were the exhibits at the May hearing, and he did not believe that S.J.S. was "being abused by the person that's being accused of abusing him." The GAL was unsure whether S.J.S. was being abused by someone else. When asked if he was concerned that Father was not significantly involved with S.J.S.'s counseling, the GAL responded

that his concern with respect to the counseling was that Mother repeatedly indicated to him that Father "didn't even really care about the counseling because he hadn't even chosen to contact the counselor," when in fact, according to Duncan, Father had contacted her more than once. The GAL expressed concern that Mother "was trying to raise any issue she could to show [Father's] lack of caring and involvement, even when it wasn't true."

{¶ 29} The GAL testified that Father expressed that he wanted everyone to get along and that he thought the current animosity was bad for everyone involved. With regard to legal filings, the GAL noted that Father "didn't file four DVs; he apparently filed the one," which the GAL viewed as primarily being an attempt to get his parenting time. The GAL stated that the allegations of abuse against Father were unsubstantiated, which was "indicia that there isn't abuse occurring, but * * * it's not conclusive." The GAL felt that the only way that S.J.S. would have "a normalized relationship" with his two parents was with the parent who would more facilitate that, which the GAL felt was Father.

{¶ 30} The GAL's report described Mother as "continuously and willfully denying Father's parenting time." When asked if Father was denied parenting time simply due to the protection orders, The GAL testified that Father initially sought to enforce his parenting time in Florida, before the case was transferred to Ohio and before any protection orders were in place. Father was awarded makeup parenting time. Then, in February 2016, Father filed an emergency motion for contempt and enforcement of parenting time, again in Florida. From these proceedings, the GAL concluded that there had been problems with Father's parenting time "right off the bat." The GAL also noted that Father was denied parenting for several months in 2018 due to a protection order that Mother

ultimately dismissed.

{¶ 31} On cross-examination by counsel for Father, the GAL stated that the case was "replete with independent findings of Mother not facilitating parenting time with Father." The GAL recommended that Father be given custody of the child.

{¶ 32} In response to questions from the court, the GAL testified that there had been no further allegations of abuse since the last ex parte hearing. He further stated that, when he spoke to the staff of S.J.S.'s preschool, they "went on and on" about how he was doing "amazingly well" at their school, especially considering that he was only there every other week. Other than Mother having trouble getting S.J.S. out of the car on one occasion, the GAL's observations of the child with both parents were that he was "happy and loved and clean and well-cared-for and okay."

{¶ 33} Father testified that the Florida court determined that reasonable communication by a parent with S.J.S. was once per day while the child was with the other parent, and that Mother would call repeatedly and then immediately try and claim that Father was denying her communication. She would call numerous times back-to-back, and if Father did not answer the phone immediately, he got "a slew of texts" from Mother, alleging that he was denying her phone contact. Father testified that, at the time of the hearing, he and Mother then try to place their phone calls between 6:30 and 7:00 p.m. He stated that he did not allow Mother to FaceTime with S.J.S. on the advice of his lawyer in Florida. When asked how many times he had called the child in the last 12 months, Father responded, "[a]t least once," but that call "went so badly, and there was so much interference and interjecting from [Mother]," that he decided phone calls were "not appropriate" and "could possibly be doing more harm than good"; Father wanted to

"minimize that for [S.J.S.]."

{¶ 34} Father testified that, when he returns S.J.S. to Mother after parenting time, "[m]any, many times, say, three, four, five days later, she'll make some allegation" of abuse. He stated that in January 2017, Mother kept S.J.S. for an entire week that was supposed to be Father's parenting time, so she had him for three straight weeks.

{¶ 35} Father testified that he did not grab or hit S.J.S. or do anything to leave bruises on him. When asked if he would continue S.J.S.'s therapy with Duncan if he were named the custodial parent, Father responded negatively, based on "the facts, her testimony, the guardian ad litem report," and other information that made him skeptical of her findings, as well as the fact that Duncan "never once" responded to his emails.

{¶ 36} Father testified that Mother first allowed him to have parenting time in the summer 2015, and he was concerned at that time that Mother let S.J.S. stay up too late at night. He stated that this was still a concern, based on Mother's attempts to initiate phone calls with S.J.S. between 8:00 and 9:00 p.m., interfering with his bedtime routine. Father stated that he was concerned that Mother did not keep S.J.S. on a regular schedule. Father testified that he missed parenting time in January and February of 2016 "because of a DV."

{¶ 37} Father testified that the previous guardian ad litem's report had stated that S.J.S. went to the doctor "at least 18 times in an 11-month period." Father stated that visits to the doctor had ceased to be that frequent "by the time [he] found out." Father denied any abuse and testified that he had ever apologized to S.J.S. for hitting him or locking him in a dark room.

{¶ 38} When the proceeding recommenced on December 6, 2018, Mother

testified. She stated that she resided in Huber Heights and was unemployed, but did find "side jobs," such as cleaning, and that her school would resume in January. Mother testified that she earned six or seven hundred dollars a month and attended the Ohio Institute of Allied Health. Mother testified that she had "just finished" her "CNA"[1] and would be starting for my "LPN"[2] in January.

{¶ 39} Mother testified that she and Father resided in Ohio when the Florida court issued the shared parenting plan; they had done "weekly parenting" since 2016, meeting at the Lebanon police station for exchanges. Mother testified that she had been paying child support to Father since January 2016, and that she filed a motion to modify or terminate child support in February 2016. She stated that, in 2017, Father's gross income was $38,000 and hers was $28,000.

{¶ 40} Mother testified that she filed a contempt motion after Father's insurance for S.J.S. lapsed four times. She also testified that she took Xanax for anxiety as prescribed by her doctor. Mother testified that she had been S.J.S.'s primary caregiver since he was born, and she always allowed Father's family to be involved in the child's life. Mother testified that she was very close with Father's father and stepmother, who were there for her throughout her pregnancy and the first two years of S.J.S.'s life, "in the absence of the Father, who was living in Colorado at the time." She testified that she allowed Father to be involved in S.J.S.'s life even before there was a court order.

{¶ 41} Mother expressed concerned about the distance S.J.S. has to travel -- namely 70 miles one way -- for exchanges, and she would like the exchange time to be

---

[1] Certified Nursing Assistant program

[2] Licensed Practical Nurse program

between 10:00 a.m. and 4:00 p.m. during daylight hours. She testified that "having two different lives, two different homes, * * * two different schools" was difficult for S.J.S. Mother stated that when, the S.J.S. returns to her, he displays "some aggression, some anger"; she testified that she was contacted by his school in Cincinnati regarding his behavior at school, specifically "hitting teachers in the face." She stated that S.J.S. was in therapy with Duncan due to his behavior and anxiety.

{¶ 42} Mother stated that she first observed bruising on S.J.S. in January 2016, after his second visit with Father. She stated that he had "a huge bruise on his cheek"; he also had numerous bruises on his chest, back, and thighs. Mother stated that she took him to the doctor, the doctor contacted authorities, and she obtained an ex parte civil protection order; Father did not see the child again until the ex parte order was dismissed. Mother stated that in May 2016, S.J.S. had what looked like finger marks and bruising on his body; she again took him to the doctor, the authorities were contacted, and she obtained an ex parte protection order. She stated that she voluntarily withdrew her petition, and Father's parenting time resumed. Mother testified that she observed bruising on S.J.S.'s bottom, ankles, and lower back in January 2018, along with scratches; she took the photographs on January 7, 2018 that were admitted in the first hearing. Mother stated that she did not take S.J.S. to the doctor on this occasion because she had been criticized for taking him there too often. Mother filed an ex parte motion to suspend Father's parenting time in the juvenile court and obtained an ex parte protection order in the domestic relations court, which she later dismissed.

{¶ 43} Mother testified that the only time she had denied Father parenting time was when there was an ex parte protection order in place. She denied speaking ill of Father

to S.J.S. Mother testified that she believed continued therapy with Duncan was in S.J.S.'s best interest. She stated that she had a hard time communicating with Father, who would only respond to her through text message, when she would prefer to speak on the phone or in person. Mother testified that she had a support network in Huber Heights, including her father, stepmother, mother, sister, two nephews, and friends, all of whom had a close relationship with S.J.S.

{¶ 44} Mother testified that she had taken S.J.S. to all of his dentist and doctor appointments since his birth. When asked about the GAL's statement in his report that S.J.S. had been potentially abused by her actions, Mother responded that her only interest was the child's best interest, which she saw as "[n]umber one, consistency," meaning to reside with her, "the one who's always been there from day one." She stated that she wanted whatever would make S.J.S. happy. Mother stated that the current, every-other-week parenting schedule would not work when S.J.S. started kindergarten in the fall, and that she wanted to be his legal and residential custodian.

{¶ 45} On cross-examination by counsel for Father, Mother was asked if she would allow S.J.S. to live with Father if that were what the child wanted; she replied: "If he didn't want to live with Mommy at all, and his heart was with Daddy, and he cried every time he saw me like he does with his father, I - - I would." She testified that she lived in a house owned by her mother, who also paid the utilities, but Mother paid her mother whatever money she made cleaning houses. Mother acknowledged that she was under a child support order and had "chosen to go to school." She stated that S.J.S. needed as much "quality time" as he can get with his mother "until all of this has come to an end." Mother stated that she earned $350 the previous week and was not paying taxes.

{¶ 46} Mother testified that she was living in Florida when she became pregnant with S.J.S., but he was born in Ohio; they lived with her mother for the first six months of S.J.S.'s life and then moved back to Florida. Mother stated that Father's parents owned the property where she lived in Florida. After returning to her mother's residence, Mother moved into her current address two years before the hearing.

{¶ 47} When asked if she had mental health issues, Mother responded, "Xanax is for anxiety. It has nothing to do with mental health. It's not a mind-altering drug." She stated that she had not taken Ambien in over a month.

{¶ 48} Mother testified that she had been unhappy with the Florida court's decision and had hired an appellate lawyer there. When asked why she dismissed the domestic violence charges, she stated, "I was informed that my child would have to be put on the stand." Mother acknowledged that Children's Services investigated every allegation of abuse, and that she dismissed her "domestic violence cases" after Children Services "made a finding of no abuse." She testified that S.J.S. had his own bedroom at her home, but that he slept in her bed.

{¶ 49} Mother acknowledged that, under the Florida order, Father was entitled to claim the child as a dependent in 2015, but that she claimed the child. When asked if she would amend her tax return to allow Father to claim S.J.S. that year, Mother responded that she needed to talk to her lawyer.

{¶ 50} Mother acknowledged that she was arrested during one of the custody exchanges with Father and spent a weekend in jail, and that Father was not arrested for that incident. Mother testified that the charges were dismissed.

{¶ 51} On cross-examination by the GAL, Mother stated that she was $1,300

behind in child support. She acknowledged that in the past two years, she had not been S.J.S.'s primary caregiver, since Father had had the child every other week. Mother acknowledged that she took S.J.S. to the pediatrician for bruising in January and May 2016, but not in January 2018. She stated that she took him to the doctor in January 2018, because of the stuttering, but not because of the bruises depicted in her photos, because she "already had the protection order in place, and [she] was just working on the healing process at that point."

{¶ 52} Mother acknowledged that S.J.S. missed 35 out of 46 days at the Miami Montessori School from March 12, 2018 through May 24, 2018. She explained that he missed so many days because he "was going through a lot emotionally with his difficult time with his speech." She said that he went to school on Tuesdays and Thursdays when speech therapy was available at the school, but that he stayed with Melanie Edwards on the other days.

{¶ 53} Mother testified that she told S.J.S. that the GAL was coming to visit that day when she picked him up from Edwards, namely that the GAL would talk to S.J.S. "about Mommy and Daddy"; Mother said that was all she told him. She acknowledged that, when she arrived at her home, the GAL was waiting and S.J.S. "was kind of having a tantrum and refusing to get out of the car and crying."

{¶ 54} On redirect examination, Mother stated that Father had filed for an ex parte protection order against her in domestic relations court and then dismissed it. When asked if she was overprotective of S.J.S., Mother responded, "I'm over attentive."

{¶ 55} Father testified that he was healthy, not on any medication, and had been employed at Beechmont Subaru in Cincinnati for three years. He stated that he earned

a base salary of $20,000, plus commissions, and worked in the service department. He had a bachelor's degree in accounting from Xavier University and owned his home.

{¶ 56} Father stated that he had health insurance for S.J.S. which had never lapsed. He stated that he currently paid $165 a month, and that in 2019 it will be about $240 a month. He stated that he pays $5,400 per year for daycare. Father stated that, pursuant to the Florida order, if he and Mother could not agree, he had final decision-making authority over issues involving S.J.S.'s education, medical treatment, and extracurricular activities. He testified that Mother's child support obligation was $301 per month, and her arrearage at the time of the hearing was $2,900.

{¶ 57} Father stated that he was not consulted about Duncan's treatment of S.J.S., nor did he give his permission for it. Father testified that he sought sole custody because of the repeated domestic violence charges. Father stated that the week-to-week parenting schedule had been in effect for two years. He stated that his home had two bedrooms and a big backyard, and S.J.S. slept in his own room. Father stated that he live in a highly-rated school district, Mariemont. He stated that he and S.J.S. were both "big into sports," play lots of soccer and basketball, and have fun playing in the yard. They also had annual passes to the museum center and the aquarium and went to some professional sports games. Additionally, Father testified that he and S.J.S. worked on flashcards, grew plants in their backyard, refilled a birdfeeder and watched the birds, cooked, and prepared healthy meals.

{¶ 58} Father testified that S.J.S. spends time with his (Father's) mother, father, stepmother, brother and sister, and a co-worker who has a son the same age. S.J.S. attends Children's Home of Cincinnati for preschool when in Father's care. He stated

that there have been no incidents there that concern him at Children's Home, but that he received a report that S.J.S. acted up, hit teachers, and kicked people while in Mother's care and attending the Studebaker YMCA preschool. When asked if he had witnessed any tantrums, Father recalled some exchanges with Mother, which he stated had also been noted in a prior GAL's report, at which Mother had been clinging to S.J.S., "drawing out the exchanges." During one incident in particular, Father recalled "over five minutes long of her holding * * * [him], whimpering face-to-face with him."

{¶ 59} Father stated that he was happy to have S.J.S. talk to his mom on the phone, but that Mother had used as a means of interfering. He testified that he took S.J.S. to Colorado in July 2017, and that Mother called the police on him numerous times. Father stated that, in the course of one call from Mother, she asked S.J.S. what he had for dinner and "apparently heard or chose to hear that [S.J.S.] did not get dinner and said, oh, you didn't get dinner; oh, my God, * * * why is your dad not feeding you dinner." He stated that, in fact, the child had actually told her that he had had dinner. When asked how many times he has been investigated regarding his care of S.J.S., Father stated that he had "lost count," that he had received "dozens of calls" and "six, eight in-home visits" by MCCS and Hamilton County Children Services. Father believed Mother would go to any extreme to obtain custody. Father testified that he received seven calls and 20 texts from Mother on S.J.S.'s last birthday, and that birthdays, special days, and holidays that that S.J.S. spends with Father "really ram[p] up the amount of interference and texts and calls" from Mother. Father stated that around Veteran's Day the previous year, he "got over 100 texts that week," and over 50 texts in one day from Mother, and that she also called him repeatedly during that time.

{¶ 60} According to Father, S.J.S. was affectionate toward him, and Father "demonstrates appropriate behavior" for his son. Father stated that Mother's calls during his parenting time were "unreasonable" and "excessive" and that as a single parent working full-time, these calls were difficult to accommodate every night during his weeks with S.J.S. He stated that, after 30 minutes on the phone, he would tell S.J.S. to "start saying our good-byes to Mommy," and then Mother would say, "oh, honey, you know, Daddy's going to rip the phone away. That's one of her phrases that she repeats over and over" to S.J.S.

{¶ 61} Father stated his opinion that, if he obtained full custody, Mother should have parenting time under the standard order, noting that it "would be impossible" for S.J.S. to attend school under the current arrangement, given the distance between the parents' homes. He stated that when he attempted to claim S.J.S. as a dependent in 2015, the IRS informed him that "another taxpayer had claimed" the child; Father was subsequently audited by the IRS and had to pay over $4,000 in taxes because Mother had claimed the child when she shouldn't have. Father also stated that he had incurred more than $500 in attorney fees to prosecute the contempt motions, as well as filing fees.

{¶ 62} On cross-examination, Father testified that he had lived in Huber Heights, for "a short period of time" before his parental rights were established, because he "had the potential" of Mother's letting him see S.J.S., but "those visits were completely cut off." After his visitation was cut off, he returned to Florida, "where the active court order was," on his attorney's advice.

{¶ 63} Father's mother ("Paternal Grandmother") testified that she lived 15 minutes from her son, and she saw him and S.J.S. during his parenting time three or four times a

week. She stated that she had never observed Father yell at or strike his son, and that S.J.S. was a typical rambunctious boy. When asked if she had observed bruises on S.J.S., she responded, "[l]ittle things between the ankle and knee that you would get from riding a bike, jumping, hopping, nothing to concern me." Paternal Grandmother testified that, if S.J.S. misbehaved, Father sat down and talked to him, "level-to-level with him," and then came up with "a solution or a choice." Paternal Grandmother stated that she had observed Father photograph S.J.S. before returning the child to Mother many times "to protect himself" and be able to "prove that there was nothing there." Paternal Grandmother testified that S.J.S. loved Father.

{¶ 64} On cross-examination by the GAL, Paternal Grandmother stated that she had seen "[i]ncoherent, disturbing, actually abusive" text messages from Mother to Father. Paternal Grandmother testified that, for example, Mother would get upset because she and S.J.S. were supposed to have a half-hour talk, but S.J.S. was acting like a three- or a four-year-old, running around, and was not interested in talking. Mother would call Father and blame him.

{¶ 65} In December 2018, the magistrate issued a decision. It noted that there was a prior order from Florida allocating parental rights and responsibilities, but both parents had requested that the Florida order be terminated and that the Ohio juvenile court designate one parent as sole legal custodian for the child. Therefore, the magistrate treated the matter as an initial allocation of parental rights and responsibilities.

{¶ 66} On the issue of jurisdiction, the magistrate noted that Mother had filed a petition to register a foreign judgment, the Florida shared parenting decree, but there had been no specific request for the Florida court to relinquish jurisdiction or transfer the case.

Under the UCCJEA, the court that originally grants a custody decree has jurisdictional priority and exclusive continuing jurisdiction over the case, but an Ohio court can modify an out-of-state custody determination if (1) it has jurisdiction to make an initial custody determination under R.C. 3127.15(A)(1) or (2), and (2) one of the two statutory factors specified in R.C. 3127.17 is applicable. R.C. 3127.15(A)(1) allows an Ohio court to make an initial child custody determination where Ohio "is the home state of the child within six months before the commencement of the proceeding * * *." In this case, there was no dispute that both parents and the child resided in the Ohio for at least the six months prior to the filing of the May 26, 2016 registration petition. Because this requirement was met, the juvenile court found that it was authorized to modify or terminate the Florida custody decision. However, the magistrate noted that the juvenile court had no authority to punish either parent for acts or omissions that occurred before Ohio gained jurisdiction over the matter and that were allegedly in contempt of another court's orders. As such, it denied both parents' pending contempt motions and found that recourse for prior violations of the Florida court's orders would have to be sought in Florida.

{¶ 67} With respect to the parenting arrangement, the magistrate found that Mother and Father had demonstrated "little or no ability to cooperate in any meaningful way," to make decisions jointly regarding the child's best interests or, "most importantly, to encourage the sharing of love, affection and contact between the child and the other parent." As such, the magistrate found that shared parenting was not appropriate.

{¶ 68} The magistrate found that S.J.S. had a good relationship with each parent, that each parent had adequate housing and income and was a "fit and suitable" custodian for the child, and that neither parent had "any substantial physical or mental health

problems, issues or deficiencies." The magistrate found that the child was well-adjusted to home and school and did not have any problems with the parenting schedule beyond those that "any average child would have under the same or similar circumstances."

{¶ 69} The magistrate found "overwhelming evidence" that Father was the parent most likely to honor and facilitate court-approved parenting time rights and abide by other court orders. The magistrate determined that, since prior to the 2015 Florida court order, Mother had "engaged in a pattern of conduct designed to deny [Father] meaningful contact with the child." Specifically, the magistrate found:

> 1. The mother has made numerous unsubstantiated claims that the father has abused the child when the credible, objective evidence is clear that it is highly unlikely that any such abuse occurred. The only independent witness to attempt to directly substantiate any abuse allegation was the child's therapist who admitted that she was only relaying what the child told her. The therapist's testimony was based on the representations of a 2-3 year old child whose mother was often present in the therapy sessions and/or who had exclusive control of the child immediately prior to the therapy sessions. As the GAL noted in his report, no other independent person, including [Children Services], the child's day care providers, teachers, the child's pediatrician, other relatives, law enforcement nor any other person substantiated or even suspected that the father was physically abusing the child. Given the totality of the circumstances, the court concludes that it is more probable than not that the child's statements to the therapist were coached by the mother;

2.   Both the present and former GAL agree that the mother's claims of abuse are not supported by the overwhelming weight of the credible information available;

3.   The mother has filed and voluntarily dismissed no fewer than four domestic violence actions against the father alleging abuse of the child with at least one resulting in this court's *ex parte* suspension of his parenting time which *ex parte* order was subsequently vacated as unsupported by the evidence;

4.   The Florida court order awarded the father "make up" parenting time from December 22, 2015 until January 8, 2016 due to the mother's failure to allow the father to have parenting time with the child;

5.   According to the Florida court order the parents were to have equal decision making authority and in the event of a disagreement that the father was to have final decision making authority regarding academic, medical and extracurricular needs.   The evidence demonstrates that the mother has wholly failed to consult with the father about any decisions that she has made concerning the child and that she has engaged the child in counseling without the Father's consent or participation.

6.   The evidence shows that during father's parenting time weeks that the mother calls the child every day and keeps the child on the phone for unreasonable lengths of time up to 30 minutes and engages in provocative conversations designed to upset the relationship between the father and the child;

7. The father took the child on vacation for a long weekend to the state of Colorado and during his time there the mother contacted the police in Colorado multiple times to do so-called "wellness checks" without reasonable cause which were apparently designed to do nothing more than harass the father, create conflict and interfere with his relationship with the child;

8. The mother made multiple referrals to [Children Services] for no reasonable cause which forced the father to suffer "dozens" of contacts with [Children Services] each and every one of which resulted in unfounded or unsubstantiated claims;

9. The mother has taken photographs of the child purporting to show abuse by the father when in fact the photographs demonstrate to any independent, objective observer skinned knees, bruised shins and other scratches and bruises associated with the normal play of a 4 year old child in order to interfere with the father's parenting time and to deny him contact with the child;

10. The mother made no fewer than 27 attempts to contact the child on the father's birthday with the sole intention to interfere with and disrupt his relationship with his child;

11. The mother reportedly sent 50 texts and made over 25 telephone calls to the child in one week during the father's parenting time;

12. The mother's texts sent to father are hostile, profanity laden and inappropriate and are plainly meant to upset him, create conflict, and chill

the full exercise of his relationship with the child;

13. Based on his exhaustive investigation the child's GAL strongly recommends that the father is the parent most likely to facilitate the child's relationship with the other parent.

{¶ 70} The magistrate concluded that it was in the child's best interest to grant legal custody to Father. According to the magistrate, Mother's attempts to interfere with Father's relationship with the child were "substantial, pernicious and ongoing," while there was no evidence that Father had engaged in any acts or omissions designed to interfere with Mother's relationship with the child. The magistrate found that Father appeared to be much more concerned with the impact of the parents' dispute on the child and had even taken steps that "unnecessarily diminished his contact with the child" during Mother's parenting time in order to avoid conflict. The magistrate found overwhelming evidence that Father was the parent most likely to facilitate court-ordered parenting time, to minimize conflict, and to facilitate the child's relationship with the other parent.

{¶ 71} The magistrate also found, pursuant to R.C. 3109.04(E)(1)(a), that the harm likely to be caused to the child by the change of environment is outweighed by the advantages of the change, based on the totality of the circumstances. The magistrate found that the current week-on week-off schedule mitigated any harm that might be anticipated from the child's relocation to Father's house full-time, but also that any harm was "plainly outweighed by the importance of facilitating the child's healthy and appropriate relationship with both parents." Finally, the magistrate found that S.J.S. would benefit from continued frequent and meaningful contact with Mother and granted her parenting time with the child pursuant to the court's standard order of parenting time,

beginning immediately.

{¶ 72} In January 2019, Mother filed objections, a request for findings of fact and conclusions of law, and a motion to set aside/stay the magistrate's decision. She argued that the decision was against the manifest weight of the evidence, noting that several witnesses had testified regarding the visible bruising on S.J.S. after time spent with Father.

{¶ 73} On February 4, 2019, the juvenile court denied Mother's request for findings of fact and conclusions of law, noting that she had failed to file proposed findings of fact and conclusions of law as required by local rule. The court further noted that the magistrate's decision included extensive findings of fact and conclusions of law, and no further findings were needed. Finally, the court granted Mother's request for a stay of the magistrate's decision until the objections were resolved.

{¶ 74} Mother supplemented her objections on July 22, 2019. She argued that the magistrate erred in terminating the shared parenting arrangement and in granting legal custody to Father with parenting time to Mother under the standard parenting order. She asserted that it was in S.J.S.'s best interest to grant legal custody to her, as she had been the child's primary caregiver since his birth. She also argued that continued therapy with Duncan was in the child's best interest. Mother asserted that she had extensive family to support her and that she encouraged S.J.S. to have a good relationship with Father. Mother noted that Father did not contact S.J.S. while the child was in her care. Mother also argued that she only withheld Father's parenting time when she observed "atypical" bruising on S.J.S. in January 2016, May 2016, and January 2018. She asserted that multiple witnesses observed this bruising. Mother cited Duncan's and

Edwards's testimony about Mother and S.J.S.'s loving relationship, the child's disclosures about abuse, and his speech regression.

{¶ 75} On August 20, 2019, Father filed a reply to Mother's supplemental objections, arguing that there was ample and overwhelming evidence to support the magistrate's decision.   .

{¶ 76} On April 23, 2020, the juvenile court overruled Mother's objections. The court stated that it had indicated that it considered the best interest factors in R.C. 3109.04(F)(1).   The court also noted that both parents sought legal custody of S.J.S. and that both believed that that the current parenting schedule would be impossible to maintain once the child began kindergarten.   The court found that the parents had not demonstrated an ability to cooperate, to make decisions jointly in the best interest of the child, or to encourage the sharing of love, affection and contact between the child and the other parent.   The court also noted that, pursuant to the Florida court order, Father was to have the final decision-making authority in the event of a dispute, yet the evidence presented showed that Mother "either failed completely to consult Father on matters or disregarded Father's decision and did as she chose."   The court agreed with the magistrate's conclusion that shared parenting was not appropriate.

{¶ 77} The juvenile court noted that, while both parents had a good relationship with S.J.S., Father was the parent most like to honor and facilitate court-ordered parenting time and other related orders; Mother had engaged in a pattern of conduct which had served to deny Father contact with the child and to interfere with Father's parenting time "for the better part of the child's life."   The court also noted that Mother had "made, or caused to be made, three unsubstantiated claims of abuse upon the child."   It was

significant to the court that there was no evidence that Father has engaged in acts or omissions designed to interfere with Mother's relationship with the child. In addition, the court recognized that the GAL had conducted a thorough investigation and strongly recommended legal custody of the child to Father.

{¶ 78} The juvenile court stated:

> While the Court is not required to find that the harm likely to be caused to the child by the change of environment is outweighed by the advantages of the change of environment to the child, the Court finds that any harm that might be caused by the child's full-time residence with father is mitigated by the current week-on-week-off schedule and any harm is plainly outweighed by the importance of facilitating the child's healthy and appropriate relationship with both parents. Thus, the Court finds, by the totality of the circumstances, that the harm likely to be caused to the child by the change of environment is outweighed by the advantages of the change.

{¶ 79} In addressing the objection to Mother's parenting time, the court considered the factors in R.C. 3109.051(D). The court concluded that it was in S.J.S.'s best interest to grant Mother the standard order of parenting time, with "any other parenting time as agreed by the parties."

{¶ 80} After reviewing the parties' financial information, the court found that "a minimum support order" was appropriate.

{¶ 81} Mother appeals from the juvenile court's judgment, asserting a single assignment of error:

THE TRIAL COURT ERRED WHEN IT TERMINATED SHARED PARENTING AND GRANTED LEGAL CUSTODY OF THE MINOR CHILD TO FATHER WITH MOTHER HAVING THE STANDARD ORDER OF PARENTING TIME.

{¶ 82} Mother's brief makes the same arguments as her supplemental objections.

{¶ 83} Father responds that the juvenile court's determination that he would honor and facilitate court-approved parenting time rights was supported by the evidence in the record and should not be disturbed on appeal.

{¶ 84} We agree with Father.   As this Court has noted:

R.C. 3109.04(E)(2)(c) permits a court to terminate a shared parenting decree. "A change in circumstances is not required before terminating shared parenting." *Curtis v. Curtis*, 2d Dist. Montgomery No. 25211, 2012-Ohio-4855, ¶ 7, citing *Brennaman v. Huber*, 2d Dist. Greene No. 97 CA 53, 1998 WL 127081, * 2 (Mar. 20, 1998). R.C. 3109.04(E)(2)(c) requires only that the court find that terminating the shared parenting decree is in the child's best interest. *Toler v. Toler*, 2d Dist. Clark No. 10-CA-69, 2011-Ohio-3510, ¶ 11, quoting *Beismann v. Beismann*, 2d Dist. Montgomery No. 22323, 2008-Ohio-984, ¶ 8.[3]

When determining whether shared parenting is in the best interest of the children, R.C. 3109.04(F)(2) states that "the court shall consider all

---

[3] *See also Bruns v. Green*, Ohio Slip Opinion No. 2020-Ohio-4787, __ N.E.3d __, ¶ 1 ("a trial court need consider only the best interest of the child when deciding whether to terminate a shared-parenting plan and which parent to designate as the residential and custodial parent of a minor child.")

relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section[4], * * * and all of the following factors:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

* * *

A trial court enjoys broad discretion when determining the

---

[4] In determining the best interest of the child pursuant to R.C. 3109.04(F)(1), the "court shall consider all relevant factors, including, but not limited to: (a) The wishes of the child's parents regarding the child's care; * * * (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) The child's adjustment to the child's home, school, and community; (e) The mental and physical health of all persons involved in the situation; (f) The parent more likely to honor and facilitate court-approved parenting time or visitation and companionship rights; (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor; (h) Whether either parent * * * previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * *; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; (j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."

appropriate allocation of parental rights and responsibilities. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect." *Id.* "The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. * * *" *Id.* Therefore, absent an abuse of that discretion, a reviewing court will affirm the custody determination of the trial court.

(Footnotes added.) *Harrison v. Harrison*, 2d Dist. Clark No 2018-CA-105, 2019-Ohio-2835, ¶ 6-7, 11.

{¶ 85} As this Court has further previously noted:

* * * [A]n abuse of discretion " 'has been defined as an attitude that is unreasonable, arbitrary, or unconscionable.' " *Mossing-Landers v. Landers*, 2016-Ohio-7625, 73 N.E.3d 1060, ¶ 21 (2d Dist.), quoting *AAAA Enterprises Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). We have also repeatedly stressed, in following *AAAA Enterprises*, that " 'most instances of abuse of discretion will result in decisions that are simply unreasonable,' " and that decisions are unreasonable if they are unsupported by a sound reasoning process. *Id.* See also, e.g., *Myers v. Brewer*, 2017-Ohio-4324, 91 N.E.3d 1249, ¶ 12 (2d Dist.).

*Buckingham v. Buckingham*, 2d Dist. Greene No. 2017-CA-31, 2018-Ohio-2039, ¶ 54.

{¶ 86} As this Court further noted in *Harrison*:

The inability of the parents to effectively cooperate or communicate

constitutes sufficient grounds for terminating a shared parenting decree. *Massengill v. Massengill*, 2d Dist. Montgomery No. 18610, 2001 WL 283001, *5 (Mar. 23, 2001); *Duricy v. Duricy*, 11th Dist. Trumbull Nos. 2009-T-0078, 2009-T-0118, 2010-Ohio-3556, ¶ 43. *See also A.S. v. D.G.*, 12th Dist. Clinton No. 2006-05-017, 2007-Ohio-1556, ¶ 52-54 (affirming the trial court's decision to terminate a shared parenting decree because the parents could no longer cooperate and communicate with each other regarding the child); *Milner v. Milner*, 10th Dist. Franklin No. 99AP-13, 1999 WL 1139965, *4 (Dec. 14, 1999).

*Harrison* at ¶ 9.

**{¶ 87}** The juvenile court's decision made clear that the court considered the relevant statutory factors and did not abuse its discretion.

**{¶ 88}** The first GAL, who filed a report on February 23, 2017, indicated:

The referenced referrals [for abuse] made to MCCS as noted above were in fact investigated and each referral was unsubstantiated. * * * During meetings with Mother, Mother made statements to the MCCS caseworker which were later determined not to be true when the caseworker followed up with the child's pediatrician. For instance, Mother reported to the caseworker that [S.J.S.] had lost three pounds while visiting with Father for one week, [but] the pediatrician stated that was not true and '[there] was no significant change in [S.J.S.'s] weight after the visit.' Further, Mother told the caseworker that the pediatrician said that the bruises on [S.J.S.] were clearly from physical abuse. The pediatrician said that was not true and

the cause of the bruises was inconclusive. MCCS also stated that after Mother was told by MCCS that there was no evidence of physical abuse, she then accused Father of being a drug user. Impressions from the caseworker were that this seemed like a custody issue and that Mother was grasping at straws trying to stop Father's parenting time. Further, it was noted that a review of the exchange videos indicated that Mother's behavior at the exchanges was likely upsetting the child.

{¶ 89} There was also a thorough report by the GAL at the time of the hearing, who testified herein. The report was 34 pages, single-spaced, and provided in part:

There is no question that, based upon the information available to this [GAL], [Father] is the parent more likely to honor and facilitate court-approved parenting time rights than is [Mother]. All of the information and documentation available to this [GAL] would appear to indicate that [Mother] has acted, her alleged concerns for [S.J.S.'s] safety notwithstanding, significantly to interfere with [Father's] parenting time as well as with [Father's] relationship with [S.J.S.] by filing abuse reports and civil domestic violence actions. Also, the [GAL] has no reason not to believe [Father's] factual assertions regarding the things that he hears [Mother] say to [S.J.S.], and the things that he hears from [S.J.S.] himself. * * * The [GAL] is unaware of [Mother's] asserting that [Father] has engaged in any actions whatsoever to interfere with her relationship with the child, other than his allegedly hanging up on her and/or not agreeing to FaceTime for her.

* * *

The information available to this [GAL], again, would indicate that [Mother] has continuously and willfully denied [Father's] right to parenting time in accordance with current court orders.

\* \* \*

With respect to the shared parenting factors, in this [GAL's] observation, the parties have demonstrated no ability to cooperate and make decisions jointly with respect to [S.J.S.], and/or to encourage the sharing of love, affection, and contact between [S.J.S.] and the other parent. The [GAL] also observes the geographic proximity of the parties to each other to cause practical problems for the sharing of [S.J.S.'s] parenting. The [GAL] acknowledges [Mother's] claims of alleged abuse by [Father] to [S.J.S.], as well as Frances Duncan's observations and assertions, but the [GAL] must indicate that it is his observation that the overwhelming weight of information available to this [GAL] \* \* \* does not support same.

\* \* \*

In the [GAL's] observation, [Mother] has seemed willing to assert whatever she felt that she needed to, to attempt to deny [Father] contact with and a relationship with his son.

{¶ 90} The GAL also noted that the Florida court had awarded Father "make-up" parenting time. The Florida judgment, which had been filed in this case, also noted that Father was the more likely of the two parents to 1) "facilitate and encourage a close and continuing parent-child relationship, to honor the timesharing schedule, and to be reasonable when changes are required," and 2) have the "demonstrated capacity and

disposition" "to determine, consider, and act upon the needs of the child as opposed to the needs or desires of the parent[.]"

**{¶ 91}** Based upon the foregoing, the juvenile court reasonably concluded that granting legal custody to Father, with parenting time to Mother pursuant to the standard order, was in S.J.S.'s best interest, that Father was more likely to honor and facilitate Mother's parenting time, and that Mother had continuously and willfully denied Father's rights to parenting time by multiple means, including unsubstantiated claims of child abuse and repeated interference and manipulation at exchanges and while S.J.S. was in Father's care. The juvenile court also reasonably concluded that Mother had failed to demonstrate an ability to encourage love, affection and contact between Father and S.J.S.

**{¶ 92}** For the foregoing reasons, Mother's assignment error is overruled.

**{¶ 93}** The judgment of the juvenile court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies sent to:

April H. Moore
Keith R. Kearney
Kenneth Krochmal, GAL
Hon. Anthony Capizzi