[Cite as *Miller v. Dendinger*, 2021-Ohio-546.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SENECA COUNTY


NATHAN J. MILLER,

    PLAINTIFF-APPELLEE,             CASE NO.  13-20-13

    v.

KELCEY M. DENDINGER,           O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Seneca County Common Pleas Court
Trial Court No. 18-DR-0055

Judgment Affirmed

Date of Decision:   March 1, 2021


APPEARANCES:

    *Rocky Ratliff* for Appellant

    *James W. Fruth* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Kelcey M. Dendinger ("Kelcey"), appeals the July 22, 2020 judgment of the Seneca County Court of Common Pleas, Domestic Relations Division, adopting and approving the magistrate's decision granting her a divorce from plaintiff-appellee, Nathan J. Miller ("Nathan"). On appeal, Kelcey challenges the trial court's allocation of the parties' parental rights and responsibilities, the trial court's assignment of a parenting coordinator, the trial court's child support calculation, and the trial court's allocation of tax dependency exemptions.

*Relevant Facts and Procedural History*

{¶2} The parties were married on October 31, 2016. The oldest child was born in 2011 prior to the parties' marriage. During the marriage the parties had another child who was born in 2017.

{¶3} On March 27, 2018, Nathan filed for divorce. At the time, Kelcey was pregnant with parties' third child, who was born later in 2018. Kelcey filed an answer and a counterclaim for divorce. Each parent requested to be designated the residential parent of the children. Nathan filed a motion for appointment of a Guardian Ad Litem ("GAL"), which was granted by the trial court. The court established temporary orders, designating Nathan as the temporary residential parent for the two older children and Kelcey as the temporary residential parent for

the newborn. Both parents were ordered to facilitate parenting time with the other parent. However, during the course of the proceedings it became apparent that the parties could not achieve this without intervention. The trial court ordered the parties to conduct all custody exchanges through Patchworks House, a third-party intermediary. Nathan was ordered to pay child support to Kelcey for their youngest child.

{¶4} On October 23, 24, and 25, 2019, the magistrate conducted a final hearing. Prior to the presentation of evidence, the parties stipulated to an agreement on the distribution of marital property.[1] Therefore, the only matters to be determined by the court pertained to the custody of the parties' three children.

{¶5} On May 28, 2020, the magistrate issued a decision on the custody matters. Specifically, the magistrate recommended that Nathan be designated the residential parent and legal custodian of parties' two older children, and that Kelcey be designated the residential parent and legal custodian of the parties' youngest child, with each party facilitating parenting time with the other parent. The magistrate declined to accept Kelcey's request for shared parenting, citing the parties' history of being unable to communicate effectively and cooperate with one another without a third-party intermediary. Thus, the magistrate recommended that

---

[1] The parties' property division was journalized upon the record in the trial court's December 4, 2019 Consent Judgment Entry on Stipulations.

the parties continue to use a third party as a parenting coordinator to resolve parenting time disputes or issues between the parties.

{¶6} In calculating Nathan's child support for the youngest child, the magistrate determined Kelcey to be voluntarily unemployed and imputed a minimum wage income to her for child support purposes. The magistrate recommended using an aggregate income figure for Nathan due to the fact that his income varied depending on overtime and other factors not within his control. The magistrate also considered the fact that Nathan was providing health insurance for all three children. The magistrate recommended that Nathan pay child support to Kelcey for the youngest child in the amount of $725.87 per month. Finally, the magistrate recommended that due to their divergent income situations Nathan should claim the federal tax exemption for all three children.

{¶7} On June 11, 2020, Kelcey filed a motion for an extension of time of thirty days to file objections to the magistrate's decision, citing additional time needed by her counsel to prepare the transcript from the three-day final hearing. The next day, the trial court granted the motion giving Kelcey until July 11, 2020 to file her objections.

{¶8} On July 8, 2020, Kelcey filed a second motion requesting an additional 14 days to file her objections, stating that her counsel had received the transcript on

July 7, 2020, and needed more time "to review the transcript testimony to incorporate into Defendant's objections." (Doc. No. 187).

{¶9} On July 14, 2020, the trial court denied Kelcey's motion for additional time, and ordered the objections to be filed before the close of the business day. No objections to the magistrate's decision were filed with the trial court.

{¶10} On July 22, 2020, the trial court issued a judgment entry approving the magistrate's decision, adopting and incorporating the magistrate's recommendations as its final orders.

{¶11} Kelcey filed an appeal from this judgment entry, asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT/APPELLANT THE OPPORTUNITY TO OBJECT TO THE MAGISTRATE'S DECISION.**

### ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED WHEN IT FAILED TO AWARD CUSTODY OF THE TWO OLDEST MINOR CHILDREN TO THE DEFENDANT/APPELLANT.**

### ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED WHEN IT ORDERED A PARENTING COORDINATOR FOR THE PARTIES.**

**ASSIGNMENT OF ERROR NO. 4**

**THE TRIAL COURT ERRED IN ITS CHILD SUPPORT CALCULATION BY USING THE WRONG INCOME INFORMATION FOR BOTH THE APPELLANT AND THE APPELLEE.**

**ASSIGNMENT OF ERROR 5**

**THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT DEFENDANT/APPELLANT ALL TAX EXEMPTIONS FOR THE MINOR CHILD THAT SHE WAS AWARDED CUSTODY.**

*First Assignment of Error*

{¶12} In her first assignment of error, Kelcey argues that the trial court erred when it overruled her second motion for an extension of time to file objections to the magistrate's decision. Specifically, Kelcey claims that the trial court was aware her counsel had not received the transcript of the final hearing from the court reporter until three days before the first extension of time was set to expire, and that this was not ample time to prepare the objections, given the length of the transcript and her counsel's schedule. Thus, Kelcey asserts she demonstrated that good cause existed for the trial court to grant the second extension of time and by failing to do so the trial court arbitrarily precluded her from filing objections to the magistrate's decision to preserve the asserted errors for appellate review under an abuse of discretion standard rather than a plain error review.

{¶13} For his part, Nathan argues that argues that both Civil Rule 53(D)(3)(b)(iii) and Seneca Co. Loc. R. 11.01 contemplate a procedure where the party objecting to the magistrate's decision must file written objections within the prescribed timeframe, and if the transcript is not available at that time the objecting party may request a reasonable period of time to supplement the written objections with specific references to the transcript. Nathan asserts that even though Kelcey's counsel received the transcript three days before the deadline to file her written objections, nothing prevented her from filing the objections within that timeframe and requesting additional time to supplement the objections once the transcript could be thoroughly reviewed.

*Standard of Review*

{¶14} "A trial court has broad discretion in determining whether to grant a motion for an extension of time and the court's decision will not be reversed on appeal absent an abuse of discretion." *Hetlin v. Hetlin*, 3d Dist. Seneca No. 13-14-08, 2014-Ohio-4997, ¶ 49, citing *Miller v. Lint*, 62 Ohio St.2d 209, 213-14 (1980). Under Civ.R. 53(D)(3)(b)(i), "[a] party may file written objections to a magistrate's decision within fourteen days of the filing of the decision * * *." "For good cause shown," a trial court "shall allow a reasonable extension of time for a party to file * * * objections to a magistrate's decision." Civ.R. 53(D)(5).

Case No. 13-20-13

{¶15} In this instance, the record reflects that the only reason Kelcey gave for needing additional time to prepare her objections was the fact that her counsel had received the transcripts three days before the expiration of the first time extension to file her objections.[2] It is apparent from its plain language that Civil Rule 53 anticipates that a transcript may not be completed within the 14-day period for filing objections. First, Civ.R. 53(D)(3)(b)(iii) provides that an objection to a factual finding "shall be supported by * * * an affidavit of th[e] evidence if a transcript is not available." Second, the same subsection provides that, "[i]f a party files timely objections prior to the date on which a transcript is prepared, the party may seek leave of court to supplement the objections." Id. We also note that the trial court's local rules also contemplate that the transcript may not be prepared before the time a party's objections are due. Local Rule 11.01(B) of the Court of Common Pleas of Seneca County, General and Domestic Relations Division states that "[i]f a finding of fact or weight of the evidence argument is part or all of the basis for the objection, a transcript of testimony is necessary to support the objection to the Magistrate's Decision and must be filed with the Court by the moving party within thirty (30) days after the filing of the objections, unless the Judge, in writing, extends the time period." Id.

---

[2] Kelcey also alleges that there was a six-day delay in the court reporter receiving the recordings of the final hearing, however, these allegations were not substantiated in the record by an affidavit from the court reporter.

-8-

**{¶16}** We are not persuaded by Kelcey's argument that the trial court's denial of her second motion for additional time deprived her of the opportunity to file objections, as she contends on appeal. The trial court first granted Kelcey a thirty-day extension so that a transcript of the proceedings could be prepared. The record demonstrates that the transcript was prepared within that thirty-day time period. Moreover, the record established that the parties' dispute at the final hearing was limited to custody matters. The magistrate filed his decision on May 28, 2020 and the trial court granted an extension until July 11, 2020 for Kelcey to file her objections. Thus, there was ample time for Kelcey to review the magistrate's decision, formulate objections to that decision within the prescribed timeframe, and then request a reasonable period of time to supplement those objections with specific references to the transcript, as provided for by the rules. Instead, Kelcey chose to file *no* objections at all.

**{¶17}** Accordingly, we determine that the record supports the trial court's finding that Kelcey did not establish good cause for requesting additional time to file objections to the magistrate's decision. We therefore conclude that the trial court did not err when it denied her motion for an additional extension of time to file the objections.

**{¶18}** The first assignment of error is overruled.

*Second and Third Assignments of Error*

**{¶19}** In these assignments of error, Kelcey claims that the trial court erred when it designated Nathan the residential parent and legal custodian of the parties' two oldest children. Kelcey also assigns error to the trial court ordering the parties to use a parenting coordinator.

*Standard of Review*

**{¶20}** Generally, "[d]ecisions concerning child custody matters rest within the sound discretion of the trial court." *Krill v. Krill*, 3d Dist. Defiance No. 4-13-15, 2014-Ohio-2577, ¶ 26, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding, the court shall take into account that which would be in the best interest of the children. R.C. 3109.04(B)(1). "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *Barto v. Barto*, 3d Dist. Hancock No. 5-08-14, 2008-Ohio-5538, ¶ 25 citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21 (1990), syllabus. "Accordingly, an abuse of discretion must be found in order to reverse the trial court's award of child custody." *Id.* at ¶ 25, citing *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994). An abuse of discretion suggests the trial court's decision is

unreasonable or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶21} However, Kelcey failed to file objections to the magistrate's decision on this basis. Civil Rule 53(D)(3)(b)(iv) provides: "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)." Therefore, because Kelcey did not object to the magistrate's decision she waived all but plain error. In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error seriously affects the basic fairness, integrity, or public reputation of the judicial process itself. *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

*Evidence Adduced at the Final Hearing*

{¶22} Testimony at the final hearing established that throughout their relationship, including a period of several years prior to their short marriage, Nathan worked outside the home providing income for the family and Kelcey stayed at home, tending to the children, N.M. (born 2011) and R.M. (born 2017). Nathan testified that during the course of the parties' relationship, he was away from the home during most weekdays and worked a considerable amount of overtime at night

and on the weekends, sometimes accumulating 100 hours in a week. As a result, Kelcey spent more time with the children, primarily handling the childcare, doctor's visits, and getting the oldest, N.M., to and from school.

{¶23} In March of 2018, N.M.'s school sent a letter to the parties informing them that N.M., a kindergartner at the time, had "reached a significant number of absences" during the 2017-2018 school year. The school records presented at the final hearing indicated that many of these absences were unexcused and without a note or other form of contact from N.M's parent, which eventually led the school to contact Kelcey to determine N.M's whereabouts on multiple occasions. In addition, N.M.'s school records further indicated that he had been tardy to school numerous times during the same school year. Notably, Kelcey acknowledged that N.M. had accumulated these absences and tardy notations, but claimed that she had a difficult time managing the children while being pregnant with J.M. and had constant car trouble.

{¶24} The record also indicates that during this time frame, March of 2018, the parties' relationship became increasingly acrimonious and contentious. Nathan learned that Kelcey had been indicted on a fourth degree felony offense for altering the date on a drug prescription given to her by a doctor, a violation of R.C. 2925.23(B)(1), (F)(1), and that a warrant had been issued for her arrest. (Pl. Ex. 54). When Nathan confronted Kelcey about the matter, a heated argument ensued

and Kelcey left the home in the middle of the night with the parties' two older children (the youngest was in utero). For her part, Kelcey claimed that Nathan had threatened to take the children from her so she left for fear of losing custody of them.

{¶25} For several days, Nathan did not know the whereabouts of Kelcey or his children until he learned that Kelcey had turned herself into law enforcement. Nathan attended Kelcey's bond hearing and attempted to locate his children. Nathan eventually located the children at Kelcey's father's residence, and brought them back to the marital home. Kelcey served approximately 11 days in jail as a result of the pending indictment.[3] Shortly thereafter, Nathan filed for divorce, initiating the instant action. The temporary orders issued by a consent judgment entry named Nathan as the temporary residential parent of then-six-year-old N.M. and nearly one-year-old R.M. The children's paternal grandmother, Nathan's mother, was tasked with providing childcare while Nathan was at work and ensuring that N.M. arrived at school on time. Nathan and Kelcey continued to live together in the marital home. Kelcey testified that she was ordered on bedrest during the last months of her pregnancy with J.M. The tension between the parties continued to escalate.

---

[3] Kelcey subsequently pled guilty to the charge and the trial court granted her motion for intervention in lieu of conviction. (Pl. Ex. 54). The trial court ordered Kelcey to enter a three-year period of rehabilitation, supervised by drug intensive probation officer. Testimony from Kelcey's probation officer at the final hearing indicated that Kelcey was doing well with complying with the terms and conditions of her rehabilitation.

{¶26} In June of 2018, Kelcey gave birth to J.M. and in mid-August 2018 Kelcey moved out of the marital home and into her father's home. In an *ex parte* order issued on August 31, 2018, the magistrate designated Kelcey as J.M.'s residential parent and granted parenting time to Nathan every Monday and Wednesday from 5:00 p.m. to 8:00 p.m. and one overnight per week with J.M. The record indicates that the parties were unable to engage in custody exchanges without confrontation or added tension from extended family members, resulting in the parties calling law enforcement to mediate their custody disputes.

{¶27} On December 10, 2018, the magistrate issued temporary orders regarding custody of all three children. Nathan remained temporary residential parent of N.M. and R.M. Kelcey was granted parenting time with R.M. (who was not school aged) on Mondays and Wednesdays from 8:30 a.m. to 5:00 p.m. Kelcey was granted parenting time with N.M. on the same days from the time she picked him up from school until 5:00 p.m. Kelcey was also granted alternate weekend parenting time with N.M. and R.M. Kelcey remained the temporary residential parent of J.M. The trial court continued Nathan's parenting time with J.M. on Mondays and Wednesdays from 5:00 p.m. to 8 p.m., and granted him alternate weekend parenting time. The record indicates that the purpose behind this custody arrangement was to keep the three children together as much as possible. The trial court also ordered the parties to use Patchworks House as a third-party intermediary

to alleviate the tension and confrontation garnered between the parties at custody exchanges. The record indicated that this custody arrangement continued for several months leading to the final hearing.

{¶28} At the final hearing, the GAL recommended that the court incorporate the parties' existing residential parent statuses into the final order and expand the amount of visitation each parent received with the child/children not under their primary care. The record indicated that the GAL had extensive experience with both parties during the course of the proceedings. He observed that dividing the allocation of primary residential parent status neutralized the parties' need to control the custody situation and alleviated some of the tension. However, he noted that under his recommendation the goal was to maximize the amount of time all three children spent together.

{¶29} The GAL testified that since Nathan had become residential parent of N.M., N.M. had accumulated no unexcused absences or tardy days during the school year. Accordingly, the GAL felt that it was important to keep N.M. at Nathan's home overnight during the week while school was in session. The GAL recommended that, while Nathan was at work, Kelcey have parenting time with R.M. every weekday during the school day from 8:30 a.m. to 5:00 p.m. and parenting time with N.M. every weekday during the school year from immediately after school to 5:00 p.m. The GAL recommended that Kelcey would also have N.M.

for the day if a school cancellation occurred. Under the GAL's plan, Kelcey would also have parenting time with all three children on alternating weekends during the school year. The GAL recommended that during the school year Nathan have overnight visitations with J.M. on Mondays and Wednesdays so that all three children could be together. During the summer, the GAL recommended that the parties exercise a one-week-on and one-week-off schedule, with each parent being entitled to up to two full weeks of vacation. Notably, the GAL recommended that a parenting coordinator continue to be involved to the case handle custody exchanges and any custody disputes that arise between the parties.

{¶30} With regard to the parties' use of a third-party intermediary, the record indicated that the since the order had been put into place requiring the custody exchanges to occur at Patchworks House the tension and potential for confrontation between the parties in front of the children had significantly decreased. Barb Flood, Executive Director of Patchworks House, testified to the mechanics of the custodial exchanges. The parent doing the "drop off" is required to arrive fifteen minutes prior to the parent doing the "pick up" to avoid the parents being there for any overlapping amount of time. She explained that there are two parking lots on either side of the building and that the parties are each required to use a different lot. Once the children arrive, a staff member escorts the children to the other side of the building to wait for the parent picking them up. Flood noted that this is designed to

avoid the parents seeing one another. She also stated that the staff kept records of when the parents arrived to Patchworks house,—i.e., if a party had arrived late or did not show at all. The staff also handled the communications between the parents relaying any cancellation of visitation and arranging for make-up parenting time.

{¶31} At the final hearing, Flood testified that Patchworks House had been facilitating the parties' custodial exchanges for ten months, and that it had been going well. She noted, however, that her records indicated that Kelcey had been late to the exchanges 82 times, totaling 332 minutes. Flood clarified that because of their policy requiring the parents to arrive at separate times, Kelcey's lateness only affected 22 minutes of Nathan's parenting time. Nathan also testified regarding the use of Patchworks House and expressed his desire to continue using an intermediary like Patchworks House because it prevented the children from seeing any animosity between the parties and it held Kelcey more accountable for her chronic lateness. He stated his concern that if the parties stopped using Patchworks House the situation between the parties would deteriorate and become hostile again. Although Kelcey stated that she "love[s]" Patchworks House staff and found them "sweet" and "easy to work with," she nevertheless objected to continuing to use them as an intermediary because of the amount of driving she had to do to facilitate the custody exchanges. (Doc. No. 186 at 146).

**{¶32}** In its judgment entry issuing the custody orders, the trial court incorporated the GAL's previously discussed custody recommendations, finding them to be in the best interest of the children, and implemented the orders for the remaining 2019-2020 school year and summers. The trial court also ordered the parties to use Flood, a qualified parenting coordinator, to continue to facilitate the custody exchanges between them. However, seemingly sympathetic to Kelcey's objections to the amount of driving she incurred during to effectuate the exchanges, the trial court ordered that the custody exchanges "shall occur at Patchworks House, unless otherwise agreed to by the parties with the consent of the parenting coordinator." (Doc. No. 192 at 4).

**{¶33}** The trial court ordered the same parenting and companionship schedule previously outlined to continue into the 2020-2021 school year and for each year thereafter, but gave the parenting coordinator discretion to implement a rotating schedule, also outlined in the judgment entry of divorce, giving each parent equal days and nights during the school year. However, the trial court instructed "should a child be late for school or any pick-up or drop off issues arise then the parenting coordinator has the discretion to revert back to the original schedule * * *." (Doc. No. 192 at 5).

*Discussion*

*1. Allocation of Parental Rights and Responsibilities*

{¶34} On appeal, Kelcey contends that the trial court erred in ordering "split custody" of the parties' children. Specifically, Kelcey contends that during the parties' marriage she was a stay-at-home parent and the primary caregiver of the children. She contends that the trial court's custody order is contrary to the roles the parties maintained during the marriage and, therefore, not in the best interest of the children. Accordingly, Kelcey maintains in her brief that the trial court should have designated her as the residential parent of all three children, however, we note that the transcript of final hearing indicated that Kelcey expressed that she wanted a shared parenting plan of "2-2-3" alternating schedule to be put in place, even though no shared parenting plan was filed with the court.

{¶35} At the outset, we note that the parties' marriage was short-lived. Therefore, we are not persuaded by Kelcey's argument to assign paramount importance to the roles of the parties with regard to childrearing during the marriage. This notwithstanding, the record demonstrates that some significant events occurred during the parties' marriage warranting a reevaluation of the parties' childrearing roles. While Nathan was admittedly less involved with the children prior to the initiation of the divorce proceedings because of the amount of hours he worked, the GAL observed, and the record supports, that Nathan had adequately met the needs

of N.M. and R.M. as temporary residential parent, including ensuring N.M. arrived at school on time. Nathan also explained that his work schedule had changed as a result of the parties' separation so that he could be home with the children more. In addition, the parties had essentially been exercising a custody arrangement similar to the one set forth in trial court's finals orders for the prior ten months without much incident. The trial court's final orders increased Kelcey's parenting time with all three children and left open the opportunity of implementing a rotating schedule if the parties could continue to maintain the peace and amicably carry out the custody exchanges.

{¶36} In short, we do not find that the trial court erred when it incorporated many of the GAL's custody recommendations into its final orders. As noted by the GAL, the parenting and companionship plan was designed to neutralize the hostility between the parents, while maximizing the opportunities for all three children to be together and remedy the prior issues with unexcused school absences and excessive tardiness, all of which are clearly in the children's best interest. Accordingly, we conclude that the trial court did not err when it maintained the parties' same residential parent statuses as designated under the temporary orders.

{¶37} The second assignment of error is overruled.

*2. Parenting Coordinator*

**{¶38}** Kelcey also argues that the trial court erred when it ordered the parties to use a parenting coordinator. As previously discussed, the parties used Patchworks House as a third-party intermediary in custody exchanges for ten months during the court proceedings. On balance, the evidence at the final hearing indicated that this arrangement greatly benefited the parties by alleviating tension and hostility at custody exchanges.

**{¶39}** On direct examination at the final hearing, Kelcey's counsel asked her about the GAL's recommendation of using Flood as a parenting coordinator, and Kelcey stated the following:

> **Q: And, in fact there was some talk, I think the Court has questioned him about Ms. Flood being in this case as potentially a parenting coordinator to be able to work out to negotiate between you and Nate if you have problems. Are you ok with that?**
>
> **A: Yes.**
>
> **Q: And she's done that in the past (inaudible)?**
>
> **A: Correct.**
>
> **Q: On throughout this case, correct?**
>
> **A: Yes.**

(Doc. No. 186 at 535-36).

**{¶40}** For the first time on appeal, Kelcey raises arguments about the propriety of the trial court's use of Flood as a parent coordinator. It is well-settled

that arguments raised for the first time on appeal will not be considered by an appellate court. *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78, 81 (1997). Because Kelcey raises this issue for the first time on appeal, this Court is not obligated to consider it.

{¶41} Moreover, under the invited error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make. *Poneris v. A & L Painting, L.L.C.*, 12th Dist. Butler Nos. CA2008-05-133 and Butler Nos. CA2008-06-139, 2009-Ohio-4128, ¶ 41. The record reflects that Kelcey had ample opportunity to make these same arguments to the trial court at the final hearing. Instead, Kelcey agreed on the record to use Flood as a parenting coordinator. Thus, any error Kelcey now proclaims was invited by her. Accordingly, we do not find that the record supports Kelcey's contention that the trial court committed plain error when it ordered the parties to use Flood as a parenting coordinator.

{¶42} The third assignment of error is overruled.

*Fourth Assignment of Error*

{¶43} In her fourth assignment of error, Kelcey argues that the trial court erred in incorporating and adopting the magistrate's recommendation for child support. Specifically, Kelcey claims that the income figures the magistrate used in the child support worksheet are not supported by the record.

*Legal Standard*

**{¶44}** When calculating child support, a court is to use the worksheet set forth in R.C. 3119.022 combined with the basic schedule set forth in R.C. 3119.021. The amount of child support established by this calculation produces a rebuttable presumption of the proper amount of child support. R.C. 3119.03; *Marker v. Grimm*, 65 Ohio St.3d 139, 141 (1992). Revised Code 3119.22 allows the court to order a deviation from the rebuttably-presumed amount after considering the factors in R.C. 3119.23. However, "[t]he party seeking to rebut the basic child support schedule has the burden of presenting evidence which demonstrates that the calculated award is unjust or inappropriate and would not be in the best interest of the child." *Murray v. Murray*, 128 Ohio App.3d 662, 671 (12th Dist.1999). Generally, a trial court has broad discretion in determining child support obligations, which will not be disturbed absent an abuse of discretion. *Saddler v. Saddler*, 12th Dist. Warren No. CA2017-09-134, 2018-Ohio-1689, ¶ 14. However, because Kelcey failed to object to the magistrate's decision, we limit our review to whether the error alleged rises to the level of plain error.

*Discussion*

**{¶45}** The magistrate determined the following regarding to parties' income and earning capacity in his child support calculation recommendation:

> **The undersigned further finds that Plaintiff/Nathan J. Miller is currently a line worker with American Electric Power. He earns**

**approximately $109,254.00 per year. His salary varies to some extent due to any overtime that he may work or if he would work out of the area for the week if there is a bad storm, disaster, or a need in another state. Currently Mr. Miller provides the health insurance for the minor children and will continue to do so through his employer. The Plaintiff's income for child support purposes is $109,254.00 per year. The amount of yearly insurance costs is $3,873.48. The cost of the health insurance is reasonable in cost.**

**The undersigned considered all of the factors 3119.0l(C)(17)(a)(i)(xi) in determining whether and what amount of income is appropriate to impute to the Defendant/Kelcey M. Dendinger. There was inquiry regarding the amount of income the [defendant] could earn if employed to full capacity, but she kept saying she does not know because she has not been able to work due to her disability. The undersigned is required to use some income information for the calculation of child support. The undersigned further finds that Defendant/Kelcey M. Dendinger is currently unemployed. The Defendant/Kelcey M. Dendinger has been approved for Social Security Disability. Those benefits were suspended due to the parties' joint income. Upon the finalizing of the divorce the Defendant should be able to get the Social Security Benefits reinstated. The defendant's income for child support purposes is $17,264.00, which is the imputed minimum wage amount.**

**The undersigned further finds that child support was calculated using the income information above. Effective April 1, 2020, plaintiff father shall pay child support for the minor children named above in the amount of $692.93 per month plus $18. 71 for cash medical support plus 2% processing fees for a total of $725.87 per month.**

(Doc. No. 181 at 10-11).

{¶46} On appeal, Kelcey claims that the number used by the trial court for

Nathan's gross income in the worksheet is not supported by the record. At the final

hearing, Nathan had testified that he worked considerably more optional overtime hours while the parties were in married in 2016 and 2017. As a result, he earned a gross income in those years of $110,493 and $123,679 respectively. However, when the parties separated, Nathan declined the overtime hours so that he could be home with the children. Nathan also took parent leave through FMLA when J.M. was born reducing his gross income in 2018 to $97,886. At the time of the final hearing, Nathan had only 29 weeks of income verified for 2019. On appeal, Kelcey speculates that Nathan's 2019 income would amount to $115,565.32, despite there being no evidence in the record to confirm that number. Aside from this speculation, Kelcey fails to specifically demonstrate how she was prejudiced by the figure used by the magistrate to calculate Nathan's child support. Based on the evidence at the final hearing, we do not find that the trial court's use of $109,254 for Nathan's 2019 gross income rises to the level of plain error. Accordingly, we find no merit to Kelcey's argument on this basis.

{¶47} Kelcey also contends that the trial court erred in determining that she was voluntarily unemployed and by imputing her income. We note that "R.C. 3119.01(C)(11)(a) authorizes a court to impute income to a parent whom the court finds is voluntarily underemployed, for purposes of calculating child support." *Yant v. Roebuck*, 3d Dist. Putnam No. 12-16-14, 2017-Ohio-2591, ¶ 24. If a trial court determines that a parent is voluntarily unemployed or voluntarily underemployed,

the trial court computes that parent's income by adding that parent's potential income to any gross income he or she may have. R.C. 3119.01(C)(5); R.C. 3119.01(C)(17). "[T]he question whether a parent is voluntarily * * * unemployed or voluntarily underemployed is a question of fact for the trial court." *Rock v. Cabral*, 67 Ohio St.3d 108, 112 (1993). Generally, a trial court's determination on this issue will not be disturbed unless the trial court is found to have abused its discretion. *Id.* As previously noted, because Kelcey failed to object to the magistrate's decision, we limit our review to whether the error alleged rises to the level of plain error.

{¶48} Kelcey testified at the final hearing that she had been a stay-at-home parent since 2012. She stated that her last job was in 2012 or 2013 working as a sales associate at a shoe store, where she worked for less than a year. She recalled that she made minimum wage at that sales job. Kelcey also stated that she sang with a band from time to time, approximately once every other month. The evidence at the final hearing further indicated that Kelcey had been receiving disability benefits of $733 a month prior to the parties' marriage in 2016, but that those benefits ceased due to their joint household income. Kelcey testified that the conditions which qualified her for disability were injuries she suffered from an ATV accident and her depression. However, Kelcey did not present any paperwork regarding the reasons for her disability benefits at the final hearing and did not know the details of her

qualifying benefits. She did indicate at the final hearing that she had reapplied for disability benefits as a consequence of the divorce.

{¶49} When asked on cross-examination about her ability to earn a minimum wage income, the following exchange transpired:

> Q: So you play in a band and you can jump from an airplane but you can't work?[4]
>
> A: I guess it would depend on what the job was.
>
> Q: Can you do anything? Can you get a minimum wage job at a McDonald's?
>
> A: I mean I guess, but I wouldn't. I would lose my insurance and my back, with my back and everything else I can't afford it. My $500 a month that I'm getting really doesn't cut it either.

(Doc. No, 186 at 127).

{¶50} Our review of the record supports the trial court's adoption of the magistrate's recommendation to find Kelcey voluntarily unemployed and to impute minimum wage income to her for child support purposes. The record indicated that Kelcey chose to be a stay-at-home parent beginning in 2012, prior to the accident that injured her back and prior to the death of her brother which triggered her depression. Moreover, Kelcey failed to present any evidence providing the details of the disability benefits that she received for a short time before marrying Nathan.

---

[4] Prior testimony had indicated that Kelcey recently went skydiving, approximately six weeks before the final hearing.

{¶51} Accordingly, we find the magistrate reviewed and considered the appropriate statutory factors in determining whether Kelcey was voluntarily unemployed. Thus, the trial court did not commit plain error in adopting the magistrate's determination that Kelcey was voluntarily unemployed, as competent and credible evidence exists in the record in support of the same.

{¶52} The fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶53} In her fifth assignment of error, Kelcey claims that the trial court erred when it designated Nathan to claim the federal tax dependency exemptions for all three children, despite the fact that he is only named the residential parent of the two older children.

*Legal Standard*

{¶54} Ordinarily, an appellate court reviews a trial court's decision allocating tax exemptions for dependents under an abuse of discretion standard. *Morrow v. Becker*, 138 Ohio St.3d 11, 2013-Ohio-4542, ¶ 9. This discretion is both guided and limited by R.C. 3119.82. However, because Kelcey failed to file objections to the magistrate's decision on this basis, we limit our review to whether the error alleged rises to the level of plain error.

{¶55} Pursuant to R.C. 3119.82, if the parties agree on which parent should claim the child as a dependent, the trial court must designate that parent as the one

who may claim the child.  However, if the parties do not agree which parent should claim the child as a dependent, the court may grant the nonresidential parent the tax dependency exemption, "only if the court determines that this furthers the best interest of the [child] and * * * the payments for child support are substantially current as ordered by the court for the year in which the [child] will be claimed as [a] dependent." R.C. 3119.82.  In determining the best interest of the child, the court shall consider a number of factors, including: any net tax savings, the relative financial circumstances and needs of the parents and child, the amount of time the child spends with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the child.  Id.

{¶56} This section, therefore, establishes a presumption in favor of awarding the tax exemption to the residential parent.  However, the court may award the tax exemptions to the non-residential parent where it furthers the best interest of the children. *Zimmerman v. Zimmerman*, 12th Dist. Butler No. CA2014-06-127, 2015-Ohio-1700, ¶ 69.   Here, the magistrate stated the following regarding his recommendation that it is in the children's best interest for Nathan to claim the tax dependency exemption for all three children:

> **Pursuant to R.C. 3119.82, the court may permit the parent who is not the residential parent and legal custodian to claim the children as dependents for federal income tax purposes if this furthers the best interest of the children. Father is designated the**

**residential parent and legal custodian of the minor children. He earns significantly more income than mother. There was no evidence or testimony presented regarding any net tax savings, the relative financial circumstances and needs of the parents and children, or the eligibility of either or both parents for the federal earned income tax credit and mother is voluntarily unemployed. Father should claim the minor children in all years. The evidence presented shows that mother is currently unemployed and will be having her social security disability payments reinstated following the conclusion of this case. There was no evidence or testimony presented regarding any net tax savings, the relative financial circumstances and needs of the parents and children, or the eligibility of either or both parents for the federal earned income tax credit. Certainly, decreasing each parent's tax liability and increasing the amount of money available in each parent's home furthers the children's best interest. The new tax law passed by Congress in December 2017 (the Tax Cuts & Jobs Act of 2017), with effective date of January 1, 2018, which reduced the federal dependency exemption for each child to $0 for the tax years 2018 through 2025. Father should claim the minor children in all years.**

(Doc. No. 181 at 11-12).

{¶57} The record indicates that the magistrate considered the factors in R.C. 3119.82 when it recommended designating Nathan to claim the tax dependency exemption for all three children. Moreover, the magistrate explicitly found that this allocation of the tax exemptions was in the children's best interest. *See Singer v. Dickinson*, 63 Ohio St.3d 408 (1992) (holding that a non-residential parent may receive the tax exemption when it produces a net tax savings for the parents in the best interests of the child); *Love v. Rable*, 3d Dist. No. 15-2000-17, 147 Ohio App.3d 63, 2001-Ohio-2174 (finding that a trial court has authority to award the tax

exemption to the noncustodial parent if it is demonstrated that there will be a net tax savings for the parents, which advances the best interest of the child). We are unpersuaded by Kelcey's unsupported assertions that the magistrate's recommendation is not in the children's best interest. Accordingly, Kelcey failed to demonstrate that the trial court's adoption of the magistrate's recommendation regarding the allocation of the tax dependency exemptions rises to the level of plain error.

{¶58} Kelcey's fifth assignment of error is therefore overruled.

{¶59} Based on the foregoing, the assignments of error are overruled and the judgment is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**